**NATIONAL LABOR RELATIONS BOARD**
**v. WINONA KNITTING MILLS, Inc.**

No. 13491.

Circuit Court of Appeals, Eighth Circuit.

Aug. 6, 1947.

Clarence Meter, Atty., National Labor Relations Board, of Minneapolis, Minn. (Gerhard P. Van Arkel, General Counsel, Morris P. Glushien, Associate General Counsel, A. Norman Somers, Asst. General Counsel, and Fannie M. Boyls and Robert Silagi, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

M. Alfred Roemisch and Benjamin H. Schwartz, both of Cleveland, Ohio (Rocker & Schwartz, of Cleveland, Ohio, on the brief), for respondent.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

The order of the National Labor Relations Board, under review, in substance requires the respondent to refrain from (1) discouraging membership in the International Ladies Garment Workers Union (hereinafter called "the union"), or any other labor organization of respondent's employees, by discharging or discriminating against such employees; (2) recognizing the Independent Textile Workers Union (hereinafter called "the Independent") as the representative of respondent's employees unless and until the Independent shall have been certified as such representative by the Board; (3) in any other manner interfering with, restraining or coercing its employees in the exercise of the rights guaranteed them in § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. The order also requires the respondent (1) to pay to certain employees, found by the Board to have been discriminatorily laid off [for one night], the wages each would have earned except for the layoff; (2) to reinstate Linda Nelsestuen (who was found by the Board to have been, constructively, discriminatorily discharged) without loss of rights or wages; and (3) to post the usual notices of compliance.

The respondent asserts that the Board's order and the findings upon which it is based are without adequate evidentiary support. We are required to decide whether there was substantial evidence that the respondent had discriminated against any of its employees or had in any other manner interfered with, restrained or coerced its employees in the exercise of their rights of self-organization, and whether, under the evidence and the law, the Board was justified in ordering the respondent to refrain from recognizing the Independent unless and until it was certified by the Board.

Upon charges filed by the Union, the Board had accused the respondent of (1) sponsoring and dominating the Independent, in violation of § 8(2) of the Act, 29 U.S.C.A. § 158(2); (2) constructively discharging Linda Nelsestuen for union activities, in violation of § 8(3) of the Act, 29 U.S.C.A. § 158(3); (3) discriminatorily laying off its night-shift employees for one night, in violation of § 8(3); (4) restraining and discouraging its employees from joining the Union, by granting them a wage increase on February 14, 1945, and by warning them against affiliating with the Union; by questioning them about union affiliations and activities; by threatening to lay off and discharge them, to discontinue its bonus system, to close the Plant, and to decrease wages if the Union became the bargaining agent for the employees; and, by threats of reprisal, forcing the withdrawal of its employees from the Union, all in violation of § 8(1) of the Act, 29 U.S.C.A. § 158(1).

The respondent denied the charges made by the Board, and the usual proceedings followed. The Trial Examiner, in his Intermediate Report, found against the Board upon the charge that the respondent had sponsored, dominated and supported the Independent in violation of § 8(2) of the Act; but found that the respondent had shown favoritism to the Independent sufficient to constitute a violation of § 8(1) of the Act. The findings of the Trial Examiner with respect to the alleged constructive discharge of Linda Nelsestuen, the asserted discriminatory layoff of night-shift sewers, and the alleged interference, restraint and coercion of the respondent's employees, were in favor of the Board.

We shall not attempt to state the evidence in detail. The respondent is an Ohio corporation, with a plant at Winona, Minnesota, where it manufactures knit goods. It is engaged in interstate commerce. Its officers reside in Cleveland, Ohio.

Early in February, 1945, the Union, by sending to each of the respondent's employees a communication inviting them to attend a union meeting on February 15, started a campaign to organize the plant. The communication referred to "The Story of the farmer who tried to save money by cutting his horse's rations. He figured his horse would never know the difference if he held out Just One Oat a day and replaced it with a grain of sawdust. The Farmer Saved Money But The Poor Horse Died." In the communication the Union outlined its program to benefit respondent's employees. William Brown, the Plant Superintendent, sent a copy of this communica-

tion to Walker Woodworth, the Secretary-Treasurer of respondent in Cleveland, Ohio.

On February 14, in the afternoon, the respondent called together all the employees in its plant to hear a prepared address by Woodworth. His address dealt with the reasons for having located the plant in Winona and with the things the respondent had done and intended to do to benefit its employees, and denied that these benefits were "sawdust in the oats." The address contained the following statements:

"Now, Mr. Dubinsky, Mr. Katovsky and Mr. Slaughter mention other benefits to be desired, too numerous to mention. Well, if Mr.Dubinsky can talk about the sawdust in the oats, perhaps we have an equal right to mention the sawdust in their oats.

"Now, at Cleveland, the dues for this union who is contacting you, the fee formerly $1.00, is now $6.50 with additional dues of $1.35 every month. The employees who are in this union are called upon to contribute a day or half a day's pay from time to time for union relief. They are required to attend meetings, and if they fail to do so, are fined $1.00 or so for not coming.

"They also require the workers to take 10% of their pay in Government bonds, and while we believe in Government bonds and hope you buy as many as you can, this is a matter each employee should decide and there is no use in your being required to buy more than you can afford.

"What I have told you today about the things we have done, and what we intend doing will not be changed by any decision you may make as to how you are to be represented, whether individually, by committee appointed by yourselves to deal directly with management, or by a union to whom you pay initiation dues and assessments. However, regardless of your decision, you are not compelled to sign any agreement of any kind with this company."

After Woodworth's address, the Independent was organized. Herbert Nichols, a shipping clerk, and Ceil Stanley, a sewing-room employee, appear to have been promoters of the Independent. A rash of signs and stickers broke out in the plant,

some pro and some anti Union. The Board's evidence indicated that anti Union signs were the more prominent and were not removed as promptly as they might have been; that favors were shown by respondent to the organizers of the Independent; that there was some questioning of employees by supervisors as to their union affiliations; that anti Union statements were made by supervisors; and that the respondent issued several communications to its employees, denying the charges of unfair labor practices which had been filed by the Union with the Board, and stating respondent's position relative to such charges.

The respondent asserts that the address of Walker Woodworth and respondent's subsequent communications to its employees were noncoercive and nonintimidating and were protected by the First Amendment to the Constitution of the United States. We think it is unnecessary to rule upon this question. The Board has not, as we understand it, held that the address and subsequent communications were per se unfair labor practices. The Board, in its decision and order, said: "We agree with the Trial Examiner that the respondent engaged in a coercive course of conduct to discourage the employees' self-organizational activities. In such a setting, and more specifically in the light of the respondent's threats of and actual economic reprisals against its employees for engaging in union activities, as disclosed in the Intermediate Report, Secretary-Treasurer Woodworth's speech to the employees on February 14, 1945, at the beginning of the Union's organizational campaign, and the respondent's letter to the employees, dated May 3, 1945, became an inseparable part of the respondent's coercive course of conduct violative of Section 8(1) of the Act. However, in concluding that Woodworth's speech fell outside the protection of the privilege of free speech, the Trial Examiner relied, in part, upon the fact that the speech was made to a compulsory audience of employees. We need not, and do not, pass upon or adopt the Trial Examiner's rationale in this regard."

■ If the address and communications of respondent were fairly to be considered a part of the totality of respondent's activi-

ties during the period in question, "we may not consider the findings of the Board as to the coercive effect" of the address and communications "in isolation from the findings as respects the other conduct of the Company." National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348; May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, 386, 66 S.Ct. 203, 90 L.Ed. 145. See and compare, Thomas v. Collins, 323 U.S. 516, 537, 538, 543, 544, 547, 548, 65 S.Ct. 315, 89 L.Ed. 430; National Labor Relations Board v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556, 558–566; National Labor Relations Board v. Kopman-Woracek Shoe Mfg. Co., 8 Cir., 158 F.2d 103, 104, 105. We gather from what the Supreme Court has said that the First Amendment protects an employer in expressing his opinions, his preferences and his prejudices relative to labor relations to the same extent that it protects all others, but that if what an employer says and what he does, together, constitute a course of conduct amounting to interference, restraint and coercion within the meaning of § 8(1) of the National Labor Relations Act, the First Amendment is of no help to him. Whether this is because what he does is to be judged in the light of what he says, or whether what he says is to be regarded as relevant circumstantial evidence of his conduct as a whole, or whether his words and acts are to be intermingled in order to ascertain whether the end product is an unfair labor practice, is not entirely clear, but probably is of no practical consequence.

The important question in this case is whether there is any basis, aside from what the respondent told its employees, to support the findings and order of the Board.

We think that the finding of the Board that Linda Nelsestuen was constructively discharged because of her union activities is without substantial support in the evidence. She was a night-shift worker and an active member of the Union. She had originally been on the day shift, but, at her request, had been transferred to night work because of her inability to find any one to care for her baby daytimes. On Friday night, April 6, 1945, she was re-

quired by Ruth Blank, the forelady of the night shift, to change thread a number of times, and finally made an inexcusably offensive and vulgar remark about Ruth Blank, which was communicated to her, and which she (Blank) resented. Linda Nelsestuen did not work on the following day, but did work the next Monday night. She had no discussion at that time about the matter, but on Tuesday when she came to work she was called down to the office of the superintendent of the plant, together with Ceil Ludwig, forelady of the day shift, and Ruth Blank. According to Linda Nelsestuen's testimony, the Superintendent told her he would like to have her go on the day shift; "he didn't see no sense for Ruth and I both being up there." She was asked what she said to that, and answered, "I told him I couldn't go on the day shift." She was then asked what he said, and replied: "Well, he just didn't have no answer. I didn't say anything. Then I asked for my release and went." We quote the following questions and answers from her cross-examination:

"Q. But he said it seemed impossible for you and Ruth to work together? A. Yes.

"Q. Did he tell you Ruth was not willing to work with you? A. He said Ceil would take me back.

"Q. And Ruth was unwilling to work with you? A. He just said he didn't see much sense of she and I being on the floor together.

"Q. And Ceil was willing to take you back? A. Yes.

"Q. Up to that time you had no idea at all that this incident [the offensive remark] was making trouble for you? Tuesday night was the first time you knew there was trouble in the air about it, is that correct? A. Yes.

"Q. So that you hadn't made any effort to find somebody to take care of your baby daytimes in April? A. No.

"Q. You didn't go any place to try to find somebody? A. No.

"Q. You didn't tell Mr. Brown the reason you couldn't shift to day work? A. No.

"Q. He told you it would be perfectly agreeable to him for you to work days? A. Yes.

"Q. Then you said you didn't want to or couldn't work days and you asked for your release? A. Yes.

"Q. And then they gave it to you? A. Yes."

There is no substantial evidence that Linda Nelsestuen's separation from her position was involuntary or due to her union affiliations or activities.

■ With respect to the issue whether the layoff of the night-shift sewers was discriminatory, we think the Board reached a permissible conclusion. Whether the conclusion was correct is not a question for this Court. The layoff took place on Friday, March 28, 1945, during the heat of the organizational campaign. The night shift apparently was composed entirely of members or partisans of the Union. No adequate explanation for the layoff was given to the girls affected. Annie Lee Hewitt, an organizer for the Union, testified that about 11:30 that night Ruth Blank, the forelady of the night shift, came out of the plant, approached Hewett, who was near the gate, and asked her, "could the plant close down and leave because of the Union coming in"; that she (Annie Lee Hewitt) "told her no, not because of the Union"; that Ruth Blank "said well, the rumors were out to that effect"; that she then "asked also if the night shift could be discontinued because they had joined the Union"; that Hewett said "no"; that Ruth Blank then "said well, they have all been laid off. I don't see why they can't be." It was Ruth Blank who, pursuant to instructions from the "superintendent of finishing," had informed the night-shift sewers that they were not to return to work until the following Monday night.

The explanation given by the respondent for the layoff was that it resulted from an error of judgment of Mike Ross, "superintendent of finishing," whose duty it was to lay out the work for the night shift; that on March 28, 1945, Brown, the Superintendent of the plant, Paul F. Ross, the Manager, and William Buol, the Office Manager, were away on business, leaving

Mike Ross [no relation of Paul F. Ross] in charge of the plant; that this was an unusual situation; that Mike Ross found that the "supply of work, cut work, for the sewers was so low" that he decided to lay off the night crew in order to supply the day crew, and notified the forelady to tell the night sewers to lay off the rest of the week; that on the following day, Paul F. Ross, Brown and Buol, upon their return to Winona, learned for the first time of the layoff in a conversation with Michael L. Finkelstein, local Business Manager of the Union, who had been informed that the respondent had "locked out the entire night shift employees"; that Paul F. Ross told Finkelstein that he knew nothing about the layoff and no reason for it, and that he would try to get all the employees back to work; that it was then too late in the afternoon of the 29th to notify them to return that night; that they were notified to return on March 30; and that Paul F. Ross thereafter met with a committee of the employees and stated to them how the layoff had occurred and that there would be no discrimination because of any girl's joining the Union. The explanation of the respondent for the layoff, if true, was a reasonable one; but the Board rejected it as untrue.

■ The question whether the layoff was discriminatory or resulted from an error in judgment on the part of Mike Ross, was, under the evidence, one of fact for the Board, and not one of law for this Court. The Board was the trier of the facts, the judge of the credibility of witnesses and the weight of evidence, the drawer of inferences from circumstantial and conflicting evidence, and the appraiser of the "imponderables." International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 79, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597–599, 61 S.Ct. 358, 85 L.Ed. 368.

It is unnecessary to discuss in detail the evidence relating to the questioning of the employees by supervisors or the anti Union statements attributed to supervisors by the Board's witnesses. While the questioning and many of the statements appear to be noncoercive and only such as might naturally occur in conversations between

workers and minor supervisory employees during any organizational campaign, there is some basis in the Board's evidence for an inference that it was intimated by those who might be regarded as having authority to speak for management that the advent of the Union would be likely to result in economic reprisals. There was evidence that Raymond Walton, a foreman, made the statement that if the Union succeeded in organizing the plant, the respondent would abolish its bonus system.

The question of the validity of the provision of the Board's order which precludes the respondent from recognizing the Independent as the representative of its employees unless and until certified by the Board, is substantially the same question which was decided favorably to the Board by this Court in Elastic Stop Nut Corporation v. National Labor Relations Board, 8 Cir., 142 F.2d 371, 380, certiorari denied 323 U.S. 722, 65 S.Ct. 55, 89 L.Ed. 580. In that case the Board had not found a violation of § 8(2) of the Act, and the only substantial distinction between that case and this case is that here the employer refused to recognize the Independent when asked to do so, while in the Elastic Stop Nut case the employer had recognized the independent union. The respondent is of the opinion that that difference in the cases justifies a different ruling here.

The only purpose that an employer can have in showing partiality to a labor union is to assist it to become the representative of his employees for the purpose of collective bargaining or to forestall the organizational efforts of some rival union. If partiality and favors to an independent union will justify the Board in restraining an employer from recognizing the independent union unless certified, it would seem to be immaterial whether the employer had or had not previously sought to recognize it. We appreciate the force of respondent's argument that the Board, after having, in effect, found the Independent to be a union which could lawfully represent respondent's employees, ought not to be permitted to hamstring the Independent, in its race for members, by

announcing that it can not function as the representative of the employees unless and until certified by the Board. We feel constrained, however, to follow the decision of this Court in Elastic Stop Nut Corporation v. National Labor Relations Board, supra, with respect to this doubtful question.

Our conclusion is that the Board is entitled to the enforcement of its order, except so much thereof as relates to the constructive discharge of Linda Nelsestuen. With that exception, the Board's order will be enforced.