## STATE OF IOWA et al. v. FEDERAL POWER COMMISSION (FIRST IOWA HYDRO-ELECTRIC COOP., Intervener).

### No. 13882.

United States Court of Appeals Eighth Circuit.

Dec. 28, 1949.

Rehearing Denied Jan. 20, 1950.

Neill Garrett, Special Assistant Attorney General of Iowa (Robert L. Larson, Attorney General of Iowa, and Robert Brooke were with him on the brief), for petitioners.

Willard W. Gatchell, Assistant General Counsel, Federal Power Commission, Washington, D. C. (Bradford Ross, General Counsel, Federal Power Commission, Louis W. McKernan and John C. Mason, Washington, D. C., were with him on the brief), for respondent.

Vernon L. Wilkinson, Washington, D. C. (Andrew G. Haley, Mr. James A. McKenna, Jr., and David W. Robinson, Jr., Washington, D. C. were with him on the brief), for intervener-respondent.

Before SANBORN, JOHNSEN, and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

The petitioners (who will be referred to as "the State of Iowa") have, pursuant to § 313(b) of the Federal Power Act, 49 Stat. 838, 16 U.S.C.A. § 791a et seq., asked this Court to review and set aside orders of the Federal Power Commission granting to the First Iowa Hydro-Electric Cooperative (hereinafter referred to as "the applicant") a license to construct a hydro-electric project in the Cedar River, which flows through Iowa. The applicant is a cooperative association, consisting of a group of seven individuals, organized under the laws of Iowa.

The project calls for an earth dam and dike across the Cedar River at Salisbury Bridge near Moscow, Iowa, about 21 miles above the junction of that river with the Iowa River and about 49 miles above the confluence of the Iowa River with the Mississippi River, creating a reservoir with an area of about 11,000 acres; a spillway section integral with the dam; a diversion canal approximately 8.5 miles long; a secondary dam and reservoir on Mad Creek of about 920 acres; a small reservoir or forebay of approximately 160 acres created by a dam across Geneva Creek overlooking the Mississippi River; a power plant consisting of four units with about 50,000 kilowatt capacity operating under a head of approximately 103 feet, with two units hav-

ing reversible pumping features; and a tailrace 8,800 feet long parallel to the Mississippi River with a discharge into the pool below Navigation Dam No. 16 on that river. The proposed project contemplates the diversion of virtually all of the water from the Cedar River at Moscow.

Before discussing the contentions of the petitioners, it is necessary to describe the proceedings upon which the orders under review are based. The applicant, on January 29, 1940, pursuant to § 23(b) of the Federal Power Act, filed with the Federal Power Commission a declaration of intention to construct and operate a dam, reservoir, and hydro-electric power plant on the Cedar River near Moscow, Iowa, without diverting the waters of the river. On April 2, 1941, the applicant supplemented its declaration of intention by filing an application for a license, under the Federal Power Act, to construct an enlarged project substantially like the one for which a license was ultimately granted. This application was treated by the applicant and the Commission as a supplement to the original declaration of intention.

On June 3, 1941, the Commission found that the Cedar and Iowa Rivers are navigable waters of the United States; that the proposed diversion of water from the Cedar River would substantially affect the flow and navigable capacity of the Iowa River; that the operation of the proposed power project would cause fluctuations in the flow and navigable capacity of the Mississippi River at Muscutine, Iowa; that the interests of interstate commerce would be affected; and that a license for the project was required under the provisions of the Federal Power Act. 2 Fed.Power Comm.Rep. 958.

On August 11, 1941, the applicant filed with the Commission its application for a license to construct the project. On November 4, 1941, the State of Iowa was granted leave to intervene in opposition to the granting of a license. After extended hearings, at which testimony was taken, the Commission, on January 29, 1944, rendered an opinion, in which it stated that "The present plans call for a practical and reasonably adequate development to utilize the head and water available, create a large storage reservoir, and make available for recreational purposes a considerable area now unsuitable for such use, all at a cost which does not appear to be unreasonable." 52 P.U.R., N.S., 82, 84. The Commission, however, concluded that the application should be dismissed because of the contention of the State of Iowa that § 9(b), of the Act required the applicant for a license to submit "satisfactory evidence that the applicant has complied with the requirements of the laws of the State * * *"; that provisions of Chapter 363 of the Code of Iowa 1939, I.C.A. § 469.1 et seq., required a permit from the State Executive Council of Iowa for the construction of the project, and that the applicant had produced no evidence that it had such a permit. The applicant petitioned the United States Court of Appeals for the District of Columbia for a review of the Commission's order of dismissal. That court affirmed the order. First Iowa Hydro-Electric Cooperative v. Federal Power Commission (State of Iowa, Intervener), 80 U.S.App.D.C. 211, 151 F.2d 20. The Supreme Court granted certiorari, and reversed with directions to remand the case to the Federal Power Commission for further proceedings in conformity with the opinion. 328 U.S. 152, 183, 66 S.Ct. 906, 90 L.Ed. 1143.

Following the remand, the State of Iowa, on June 28, 1946, petitioned the Commission to reopen the case for the taking of further evidence, and for the presentation and consideration of pertinent questions of law and fact. In its petition the State asserted that the Commission, under the Federal Power Act, lacked jurisdiction to license the proposed project because: (1) the Cedar River is a non-navigable river and had been so declared by Congress; (2) the ex parte findings of the Commission of June 3, 1941, were made without notice to the State of Iowa, its political subdivisions or interested citizens; (3) the assumption by the Commission of jurisdiction to conduct further proceedings would require the taking of further evidence with respect to compliance by the applicant with § 9(b) of the Federal Power Act, the Rules of Practice and Regulations of the Commission,

and the laws of Iowa relative to the bed and banks of the Cedar River and the appropriation, diversion and use of the water of the river for power purposes, and with respect to the right of the applicant to engage in the business of developing, transmitting and distributing power. The State of Iowa also asserted that the Commission was required to conduct further proceedings relative to the plan of financing the cost of the project and the project's soundness, feasibility and practicability.

On August 6, 1946, the Commission entered an order reopening the record, but only for a further showing as to the design and economic feasibility of the project. The State of Iowa, on August 26, 1946, again petitioned the Commission to reconsider the issue of the Commission's jurisdiction. This petition was denied on September 24, 1946. The Trial Examiner, who had been appointed by the Commission to conduct the hearings, held the further hearing provided for in the Commission's order of August 6, 1946. The issues were confined to (1) the design of the Cedar River dam; (2) the design of the canal; (3) the design of the Geneva Creek dam and power house section; (4) the economic feasibility of the project; and (5) the applicant's plans for financing the project. At the hearing, the State of Iowa made an offer of evidence relative to the issue of jurisdiction, which the Trial Examiner rejected.

From the evidence adduced at the hearing, the Trial Examiner found that the applicant's plan of financing provides for the sale of 40-year 4% revenue bonds to finance the entire cost of the project; that the project could be financed by the issuance of such bonds, amortized over a 30-year period, if the applicant had binding contracts for the sale of electric energy for a period of about ten years, with sufficient operating revenues assured to cover the estimated cost of operation, maintenance, reserves, and 133 per cent of the debt service; but that the applicant had no firm contracts at all and no such assurance of revenues, and no firm commitments for financing. The Trial Examiner also found that:

"This Commission has heretofore held, in the matter of Gasconade River Power Company, Project No. 934, decided October 6, 1937, that a proposal to issue bonds to cover the *entire* cost of construction and financing of a project is not in harmony with sound principles of finance. (1 FPC 424 at 429).

\*    \*    \*    \*    \*    \*

"The reasonably anticipated cost of the proposed project, together with necessary working capital to meet a possible deficiency of available water in the first year of operation, is now $23,000,000.

\*    \*    \*    \*    \*    \*

"The Applicant has not, up to the present time, shown the proposed project to be economically feasible with present high construction costs. Neither has it shown any firm commitments for the financing of the project or for the sale of the energy to be generated. Furthermore, it has not shown what facilities, if any, will be used to transmit such energy to prospective consumers. Although the application states a proposal that transmission lines should be constructed by a transmission cooperative, as a separate project, no evidence of the existence of either transmission cooperative or project for transmission lines has been offered.

"The issuance of a license is not justified by the record as it now stands."

The State of Iowa excepted to the report of the Trial Examiner upon the ground that his figure of $23,000,000 as the cost of the project was too low, and that, even if the cost did not exceed that amount, the project would operate at an annual deficit of about $850,000; and that the evidence conclusively showed that the project was not economically feasible.

After oral argument before the Commission on exceptions to the report of its Trial Examiner, it entered an order on December 19, 1947, authorizing the issuance of the license to the applicant, subject to compliance with certain conditions, among which were the approval by the Chief of Engineers and the Secretary of the Army of the project plans in accordance with §

4(e) of the Federal Power Act and the submission of "satisfactory evidence of commitments to finance construction of the project."

An application for rehearing filed with the Commission by the State of Iowa on January 19, 1948, was dismissed by the Commission on January 30, 1948, on the ground that its order of December 19, 1947, was an intermediate, and not a final, order.

On August 31, 1948, the applicant wrote the Secretary of the Commission, stating that the Chief of Engineers and the Secretary of the Army had approved the project plans, and that, in satisfaction of the proviso that the applicant submit satisfactory evidence of commitments to finance construction of the project, the applicant enclosed a letter of August 31, 1948, from William J. Neal, Acting Administrator of the Rural Electrification Administration, relative to the need and market for the power to be generated by the project,[1] and a letter, dated August 30, 1948, from A. L. McDougal, Jr., President of McDougal and Condon, Incorporated, indicating that that firm would proceed to complete the financing program as soon as the license for the project was issued by the Commission.[2]

On September 3, 1948, the State of Iowa wrote a letter to the Commission, asserting that the letter of McDougal and Condon, of Chicago, contained no commitment of any kind; that the letter was not evidence of any plan of financing, and was not binding upon its writer; and that the letter of William J. Neal was a mere expression of opinion.

On September 8, 1948, the Commission entered an order authorizing the issuance

1. "Rural Electrification Administration.
Office of the Administrator.
Washington.
August 31, 1948.
First Iowa Hydro-Electric Cooperative
Attention: Mr. H. J. Strong
1011 East High Street
Davenport, Iowa.
Gentlemen:
This is in response to your request that we comment upon the possibilities of your supplying power to REA cooperatives in the area of your proposed hydro-electric development. As you know, the REA does not purchase electricity for its borrowers, but assists them in their negotiations with suppliers of energy and approves or rejects wholesale power contracts.
Rural electric loads have increased greatly in the past few years and are expected to continue growing in the future. This is especially true in the area surrounding the proposed hydro development, load data for which have been made available to you. It is our opinion that a market for the sale of power to the REA cooperatives in the area exists and will exist in the future if energy is made available to our borrowers at sufficiently low cost.
Sincerely,
/s/ William J. Neal,
Acting Administrator."

2. "McDougal and Condon, Incorporated.
208 South La Salle Street, Chicago 4,
Illinois,
August 30, 1948.
First Iowa Hydro-Electric Co-operative
1011 East High Street
Davenport, Iowa.
Attention: Mr. H. J. Strong
Gentlemen:
The primary purpose of this letter is to enable you to meet the requirements of the Federal Power Commission under its order of December 19, 1947 (Project No. 1853) that your Corporation submit satisfactory evidence of commitments to finance the construction of the project.
As you know with our consulting engineers, and your Co-operative, we have been engaging in negotiations with the Rural Electrification Administration to determine that administration's attitude toward the use of all the capacity and energy to be available at the project for a federation of Rural Electrification Administration Co-operatives, and we have satisfied ourselves that there will be a market for all of this energy and capacity. Accordingly, we feel that the obligations which your corporation can issue for construction purposes will be marketable.
When the license for the project shall have been issued by the Federal Power Commission, we will be glad to proceed with the completion of your financing program.
Yours very truly,
McDougal and Condon,
Incorporated.
By /s/ A. L. McDougal, Jr.,
President."

426

of the license, upon the usual conditions. The Chairman of the Commission dissented on the ground that the Commission's regulations governing applications for major project licenses required, among other things, a showing of the proposed use or market for the power to be developed and a statement or explanation of the proposed method of financing; and that no specific, definite, or satisfactory information on those subjects had been submitted by the applicant.

The State of Iowa, on October 6, 1948, filed a petition for rehearing with respect to the orders of September 8, 1948, and December 19, 1947, and of all other adverse orders, findings and rulings of the Commission in the case. The State again in its petition challenged the jurisdiction of the Commission to grant the license, and asserted that the Commission had not complied with § 9(b) of the Act by requiring the applicant to produce satisfactory evidence that it had complied with the requirements of the applicable laws of Iowa. The State also asserted, in effect, that there was no adequate evidentiary basis for concluding that the project was economically feasible or that any sound plan for financing it existed. The Commission denied the petition of the State for a rehearing, and the State has now petitioned this Court to review and reverse the orders of the Commission granting the applicant a license.

The first question which the State of Iowa seeks to raise is that of the jurisdiction of the Commission to authorize the proposed project. That question we must decline to consider or discuss, because of the opinion of the Supreme Court in First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, in which the Court said, at page 163, 66 S.Ct. 906, at page 911: "The project is clearly within the jurisdiction of the Commission under the Federal Power Act." In view of that plain language, it would be improper for this Court to rule that the Supreme Court had not passed upon the question of the Commission's jurisdiction over the proposed project.

We shall next consider the contention that the Commission, in disregard of § 9(b) of the Federal Power Act, failed and refused to give consideration and effect to the requirements of certain laws of the State of Iowa, namely, (1) the provisions of Chapter 363 of the Code of Iowa 1939, now Chapter 469, Code of Iowa 1946, I.C. A., requiring a State permit for the building of a dam in a meandered stream; (2) the provision in § 7796 of the Code of Iowa 1939, now § 469.30, Code of Iowa 1946, I.C. A., requiring a permit from the State Highway Commission where a dam affects public highways; (3) Chapter 246 of the Laws of the 52d General Assembly of Iowa 1947, I.C.A., § 469A.1 et seq., requiring an applicant such as the one in this case to secure from the Executive Council of Iowa a Certificate of Convenience and Necessity to engage in business in Iowa; and (4) Chapter 383 of the Code of Iowa 1939, now Chapter 489, Code of Iowa 1946, I.C.A., requiring a State franchise for the erection, maintenance, or operation of transmission lines.

We think that the decision of the Supreme Court in the First Iowa Hydro-Electric Cooperative case, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143, disposes of this contention. As we read that opinion, it holds that § 9(b) of the Act does not require the Commission to compel the applicant to produce evidence that it has complied with all of the applicable laws of Iowa before a license may be granted. Speaking of § 9(b) of the Act, the Supreme Court said at page 177 of 328 U.S., at page 918 of 66 S.Ct.: "It [§ 9(b)] does not itself require compliance with any state laws. Its reference to state laws is by way of suggestion to the Federal Power Commission of subjects as to which the Commission may wish some proof submitted to it of the applicant's progress. The evidence required is described merely as that which shall be 'satisfactory' to the Commission. The need for compliance with applicable state laws, if any, arises not from this federal statute but from the effectiveness of the state statutes themselves."

The Court also said at page 181 of 328 U.S., at page 920 of 66 S.Ct.: "The detailed provisions of the Act providing for the federal plan of regulation leave no

room or need for conflicting state controls. * * * "

We gather from the opinion of the Supreme Court that, while the Federal Power Commission may properly concern itself with the question whether an applicant for a license can comply with applicable state laws, if any, relating to the proposed project and the business in which the applicant proposes to engage, the Commission is not compelled to do so, but may license the project and let the licensee take his chances of being able to comply with the applicable state laws, or such of them as have not been superseded by the Federal Power Act. We think that the challenged orders of the Commission may not be invalidated by this Court because of the asserted noncompliance by the Commission with § 9(b) of the Act.

That brings us to the questions of the alleged infeasibility of the project and of the asserted failure of the applicant to show any sound plan for financing its cost.

■ It is certain that this Court may not retry the controversy, substitute its judgment for that of the Commission as to any doubtful or debatable questions of fact, or reverse the challenged orders because the Commission has rejected the views of the State of Iowa as to what inferences should be drawn from the evidence. The Commission "is the agency which weighs the relevance of factual data." See National Labor Relations Board v. Stowe Spinning Co., 336 U.S. 226, 231, 69 S.Ct. 541, 545.[3] The Commission, which presumably consists of a body of experts, has, after an investigation and extensive hearings, concluded, from the evidence adduced, that there will be an adequate market for the electric power produced by this hydroelectric project, at prices sufficient to insure successful operation; that the project is in the public interest; and that the entire cost of acquisition and construction can be financed by the sale to the public of 40-year 4% revenue bonds.

■ We fail to find in the Act itself any express prohibition against the issuance of a license to an applicant who is not financially responsible or to one who has no firm or enforceable commitments for the sale of power or for the financing of the cost of the proposed project. While it reasonably may be thought that Congress did not intend that licenses should be issued to applicants whose securities, issued to finance a project of doubtful feasibility, would be likely to work a fraud upon purchasers, Congress rather obviously left the Commission a broad discretion in dealing with the questions of economic feasibility of a project and the soundness of proposed plans for financing its construction.

It is true, as the State of Iowa asserts, that in 1937, in the Matter of Gasconade River Power Company, 1 F.P.C. 424, the Commission condemned the financing of the entire cost of such a project by the issuance and sale of bonds. In that case, the Commission said, page 428 of 1 F.P.C.: "* * * It is this type of financing which has in the past been so largely responsible for the misfortunes of investors in public utility securities. Even if there were no other obstacles to the granting of a license for this project, this Commission

3. See and compare, also, Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260; Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147; International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597–599, 61 S.Ct. 358, 85 L.Ed. 368; Gray v. Powell, 314 U.S. 402, 412–413, 62 S.Ct. 326, 86 L.Ed. 301; National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305; Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 542, 63 S.Ct. 1214, 87 L.Ed. 1568; Dobson v. Commissioner, 320 U.S. 489, 501–502, 64 S.Ct. 239, 88 L.Ed. 248; National Labor Relations Board v. Pittsburgh Steamship Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; National Labor Relations Board v. Winona Knitting Mills, Inc., 8 Cir., 163 F.2d 156, 160; Donnelly Garment Co. v. National Labor Relations Board, 8 Cir., 165 F.2d 940.

would not willingly sanction or permit such a financial plan."

While we may entertain the same views as those expressed by the Federal Power Commission in the Gasconade case and by the Trial Examiner, the Chairman of the Commission, and the State of Iowa in this case with respect to the economic feasibility of the project and the soundness of the proposed plan of financing its construction, that would not, in our opinion, give us the right to vacate the orders of the Commission granting the license. If this license has been improvidently granted, as the State of Iowa insists, whatever stigma may subsequently attach to its issuance or to the execution of the questionable plan for financing the cost of the project will have to be borne by the Commission alone. It is to be remembered that, within the limits of the jurisdiction conferred upon it, the power of a court or an administrative agency to decide questions is not confined to deciding them correctly. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701, affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251.

The contention of the State of Iowa that the challenged orders are invalid because of the alleged failure of the Commission to give adequate consideration to the effect of the project upon wildlife resources, as required by the Act of August 14, 1946, amending the Act to Promote Conservation of Wildlife, Fish, and Game, and for Other Purposes, approved March 10, 1934, 60 Stat. 1080, 16 U.S.C.A. §§ 661-665, 666-666c, is, we think, without substantial merit. One of the conditions of the license is that "The licensee shall construct, maintain and operate such fish protective devices and shall comply with such reasonable conditions in the interest of fish life as may be hereafter prescribed upon the recommendation of the Secretary of the Interior." The Commission in its brief points out that, in the hearings held prior to the enactment of the Act of August 14, 1946, the Iowa Conservation Commission, as intervener, appeared and produced evidence "with regard to fish life in the area and the probable effect of the project there-

on." Apparently, the views of the State Conservation Commission were received and considered by the Federal Power Commission. Moreover, under the terms of the license, the applicant may still be required to do whatever may be reasonable for the protection of fish life. The defects, if any, in the Commission's proceedings relative to the protection of wildlife resources could not, in our opinion, be regarded as sufficiently vital or prejudicial to justify a vacation of the orders under review.

Our conclusion is that the petition of the State of Iowa to set aside the orders of the Federal Power Commission must be denied. It is so ordered.