**STATE OF WASHINGTON DEPARTMENT OF GAME et al. v. FEDERAL POWER COMMISSION.**

No. 13289.

United States Court of Appeals, Ninth Circuit.

Oct. 5, 1953.

Don Eastvold, Atty. Gen., William E. Hicks, Harold A. Pebbles and Lee Olwell, Sp. Assts. Atty. Gen., Olympia, Wash., for petitioners, State of Washington.

Stephen J. Morrissey, Seattle, Wash., for petitioner, Washington State Sportsmen's Council, Inc. Clarence M. Boyle, Corp. Counsel, Dean Barline, Asst. Corp. Counsel, E. K. Murray, Sp. Counsel, City of Tacoma, Washington, for intervener, City of Tacoma, Wash.

Bradford Ross, Gen. Counsel, Willard W. Gatchell and Howard E. Wahrenbrock, Assts. Gen. Counsel, John C. Mason, Atty., Federal Power Commission, Washington, D. C., for respondent.

Before STEPHENS, HEALY and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Since 1893, the City of Tacoma, a municipal corporation in the State of Washington, has produced, transmitted, distributed and sold for use electric energy generated in its own steam electric and hydroelectric plants. On December 28, 1948, the City filed with the Federal Power Commission an application for a

license [1] to construct, operate, and maintain two dams (one designated as the Mossyrock, the other as the Mayfield) with appurtenant power facilities on a State of Washington river known as the Cowlitz. The Cowlitz River flows southerly into the Columbia River seaward of Portland, Oregon.

The Mossyrock Development is proposed to be located sixty-five miles upstream from the Cowlitz mouth and is to comprise a dam rising five hundred feet above bedrock which will intercept the river runoff and store the accumulated water in a natural reservoir twenty-one miles in length. The flow will be equated through the dam and through a hydroelectric power plant having an initial power potential of 225,000 kilowatts and an ultimate potential of 75,000 more kilowatts.

The proposed Mayfield Development is to be located thirteen and one-half miles downstream from Mossyrock and is to consist of a dam rising two hundred forty feet above bedrock, a power plant with an initial potential of 120,000 kilowatts with an ultimate potential of an additional 40,000 kilowatts.

The Federal Power Commission took jurisdiction of the application and, in an order issued March 8, 1949, found that the construction and operation of the project would affect lands of the United States, that the Cowlitz River was navigable below the site of the proposed dams and that their construction would affect the interests of interstate and foreign commerce. Accordingly, it concluded that Tacoma could not legally build the dams without a Federal Power Commission license. [2]

Thereupon the Commission ordered a public hearing to determine whether the license should issue. The "State of Washington Departments of Game", of "Fisheries", and the "Washington State Sportsmen's Council, Inc.," (a private corporation), all hereinafter to be called "Petitioners", were permitted to intervene in opposition to the City's application. The Attorney General for the State appointed a special assistant attorney general to represent all persons not otherwise represented whose views were in conflict with the State Departments of Game and Fisheries. Thus, the State of Washington by its Attorney General, and the people of Washington holding views not in harmony with the State's official position, and the applicant City of Tacoma were represented at the hearing which was had before an Examiner.

Having heard the evidence offered by the interested parties, the Presiding Examiner issued his "Recommended Decision" in which he made findings of fact with his conclusion that the application for license should be denied because the proposed construction would conflict with the comprehensive plan [3] for developing the Columbia River Basin and for that reason would not be best adapted "for other beneficial public uses, including recreational purposes", [4] because "it has not been shown that the development of the Cowlitz River for power at this time is such an economic necessity as to warrant the undertaking proposed, so long as that construction may be

1. Section 4(e) of the Federal Power Act, Title 16 U.S.C.A. § 797(e).

2. Section 23(b), Federal Power Act, Title 16 U.S.C.A. § 817.

3. The Fish and Wildlife Service of the Department of the Interior has formulated what is known as the Lower Columbia River Fishery Plan. This plan, which includes within its scope the Cowlitz River, contemplates the improvement of the fish runs on the Columbia River through the cooperative efforts of Oregon, Washington, and the United States Fish and Wildlife Service in the removal of obstructions to the passage of fish, the abatement of pollution, the screening of diversions, and the use of hatcheries and fish refuges.

"The Review Report on the Columbia River and Tributaries," prepared by the Army Corps of Engineers, included with approval the Lower Columbia River Fishery Plan.

4. Section 10, Federal Power Act, Title 16 U.S.C.A. § 803(a).

deemed probably injurious to the protection and maintenance of the valuable runs of anadromous fish [fish which return to their spawning grounds for spawning] now utilizing the river." [5]

The City of Tacoma, the Special Assistant to the State Attorney General (opposing the position of the State Attorney General), and the Commission Staff Counsel filed exceptions to the Recommended Decision. The Commission ordered oral argument [6] and subsequently filed an opinion and order granting the license. We summarize the pertinent findings and conclusions of the Commission as follows:

1. The Commission reasserts its jurisdiction and describes the physical characteristics of the project.

2. The project will increase the navigability of the Cowlitz River by increasing the average minimum flow below the dams.

3. The reservoirs are easily accessible by state highway for recreational opportunities.

4. An annual increase of 40,000 kilowatts in peak load electric energy requirements in the Tacoma-Seattle area is anticipated. This estimate does not include defense activities.

5. There is a power shortage in the Northwest, especially in the Puget Sound area.

6. A ten-year power shortage is anticipated. Thus, new power sources must be developed to supply new loads.

7. There is no evidence that any other hydroelectric project in lieu of the Cowlitz Project could be constructed as quickly or as economically.

8. The cost is estimated at $135 million exclusive of fish handling facilities.

9. The cost of fish handling facilities is estimated at $7,100,000.

10. The annual value of Cowlitz power will exceed the cost of production by at least $1,700,000, based on a 2% interest rate.

11. There will be substantial flood control and navigation benefits.

12. The debt incurred in building the project can be retired in a reasonable time.

13. The Lower Columbia River Fishery Plan [7] conceived around 1945 by the Fish and Wildlife Service of the Department of the Interior and approved by the United States Bureau of Reclamation and by the Army Engineers, contemplates individual state action with the aid of Congressional appropriations.

14. The ladder system of passing fish upstream should not be rejected although engineering and biological studies must still be made.

15. Hauling and trapping should be a satisfactory alternate for getting fish upstream.

16. Testing and experimentation should make it possible to develop means of successfully passing fish downstream.

17. The value of the fish spawning above the dams equals the value of the fish spawning below the dams.

18. The fish below the dams will not be injured by the dams.

19. The project is economically and financially feasible.

20. Tacoma is a municipality within the meaning of Section 3(7) [8] of the Act and has submitted satisfactory evidence of compliance with the requirements of all applicable state laws "insofar as necessary to effect the purposes of a license for the project." [9] Finding No. 53, Transcript of Record on Appeal, page 551.

21. Tacoma has submitted satisfactory evidence of financial ability to complete the project.

22. There is no conflicting application.

5. Record on Appeal, pp. 170–1.

6. Title 18 C.F.R. § 1.31.

7. See footnote 3, supra.

8. Title 16 U.S.C.A. § 796(7).

9. Cf. Section 9(5), Federal Power Act, Title 16 U.S.C.A. § 802(b).

23. Due notice has been given to all interested parties.

24. "Under present circumstances and conditions and upon the terms and conditions hereinafter included in the license, the project is best adapted to a comprehensive plan for improving or developing the waterway involved for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the conservation and preservation of fish and wildlife resources, and for other beneficial public uses including recreational purposes."[10]  Finding No. 59, Transcript of Record on Appeal, page 552.

Petitioners sought a rehearing, but it was denied. Thereupon, they sought review in this court.[11]

It is provided in the Federal Power Act that:

> "§ 9. Each applicant for a license under this chapter shall submit to the Commission—
>
> \*  \*  \*  \*  \*  \*
>
> "(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State  \*  \*  \*  within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter.  \*  \*  \*"

10. Cf. Section 4(e), F.P.A., Title 16 U.S.C.A. § 797(e), second proviso, and Section 10(a), F.P.A., 16 U.S.C.A. § 803(a).

11. Section 313, F.P.A., 16 U.S.C.A. § 825l, (a), limits rehearings to "any person, State, municipality or State commission aggrieved by an order issued by the Commission". And it confines review by this court to those who have applied for rehearing. Thus, as Tacoma contends in its brief, petitioners are not properly before this court unless they fit one of the categories listed in § 825l (a), as defined by § 796, Title 16 U.S.C.A.

Those opposing the application challenge the authority of the Commission to issue a license upon the ground that the quoted section has not been complied with, in that:

1. Tacoma has not obtained from the State Supervisor of Hydraulics a permit for the diversion of water as required by Ch. 112, § 46, State of Washington Laws of 1949.

2. Tacoma has not obtained the written approval of the State Directors of Fisheries and of Game as to plans and specifications for the proper protection of fish life in connection with the construction of the dams as required by Ch. 112, § 49, State of Washington Laws of 1949.

3. Both of the proposed dams exceed the 25-foot height limit which the Washington legislature put upon the construction of dams on the Cowlitz River or on any stream of the State tributary to the Columbia River downstream from the McNary Dam and within the migratory range of anadromous fish. The Columbia River Sanctuary Act, Ch. 9, § 1, State of Washington Laws of 1949.

The rationale of the objectors' contentions has already been considered and rejected by the Supreme Court in First Iowa Hydro-Elec Co-op. v. Power Commission, 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143. In that case the United States Supreme Court analyzed § 9(b) in the light of an Iowa statute which prohibited the building or maintaining of a dam on any navigable stream of the State of Iowa without a permit from the Executive Council of the State. In

Initially we note that this court has jurisdiction because the Washington State Sportsmen's Council, Inc., one of the petitioners, is a person within the definition of § 796(4), since it is a corporation. The State of Washington Department of Game and the State of Washington Department of Fisheries are proper parties since they represent certain interests of the State of Washington in this controversy. All are "parties aggrieved" since they claim that the Cowlitz Project will destroy fish in which they, among others, are interested in protecting.

396

order to obtain a State permit, an applicant was required to comply with State regulation of the project. The Supreme Court held that the Iowa licensing provisions were in direct conflict with the Federal Power Act, and that if a State license were a "condition precedent to securing a federal license for the same project under the Federal Power Act * * * the Executive Council of Iowa [would possess] a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act." 328 U.S. at page 164, 66 S.Ct. at page 911. Indeed, if § 9(b) were construed to require compliance with state laws in every instance, it would make every application to the Federal Power Commission subject to state control in direct contradiction to the Congressional mandate that the project be subject to "the judgment of the Commission".[12] Therefore, the Supreme Court concluded, § 9(b) does not in itself require compliance with state law; it only empowers the Commission to require such evidence of compliance with state law as, in the Commission's judgment, would be "appropriate to effect the purposes of a federal license on the navigable waters of the United States." First Iowa Hydro-Elec. Co-op. v. Power Commission, supra, 328 U.S. at page 167, 66 S.Ct. at page 913.

The Commission in our case acted within the scope of its discretion in not requiring Tacoma to show compliance with the laws of the State of Washington regulating the construction of dams in Washington, because compliance with those laws would have prevented the development of the Cowlitz Project; and in the opinion of the Commission of the Cowlitz Project was "best

adapted to a comprehensive plan" for the development of a concededly navigable stream. The Federal Government's Constitutional authority to regulate commerce and navigation includes the "power to control the erection of structures in navigable waters", United States v. Appalachian Power Co., 1940, 311 U.S. 377, 405, 61 S.Ct. 291, 298, 85 L.Ed. 243. The Federal Government's power over navigable waters is superior to that of the state. McCready v. Virginia, 1876, 94 U.S. 391, 24 L.Ed. 248.

The objectors further contend that Tacoma, as a creature of the State of Washington, cannot act in opposition to the policy of the State or in derogation of its laws.[13]

Again, we turn to the First Iowa case, supra. There, too, the applicant[14] for a federal license was a creature of the state and the chief opposition came from the state itself. Yet, the Supreme Court permitted the applicant to act inconsistently with the declared policy of its creator, and to prevail in obtaining a license.[15]

Consistent with the First Iowa case, supra, we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license or bar the licensee from acting under the license to build a dam on a navigable stream since the stream is under the dominion of the United States. However, we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted. There may be limitations in the City Charter, for instance, as to indebtedness limitations. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but

12. Title 16 U.S.C.A. § 803(a), § 10(a), Federal Power Act.

13. See Williams v. Mayor of Baltimore, 1933, 289 U.S. 36, 53 S.Ct. 431, 77 L. Ed. 1015.

14. First Iowa Hydro-Electric Cooperative, a cooperative association organized under the laws of Iowa.

15. First Iowa Hydro-Elec. Co-op. v. Power Commission, 1946, 328 U.S. 152, 66 S. Ct. 906, 90 L.Ed. 1143; State of Iowa v. Federal Power Commission, 8 Cir., 1949, 178 F.2d 421, certiorari denied 339 U.S. 979, 70 S.Ct. 1024, 94 L.Ed. 1383.

the Commission has no power to adjudicate them.[15a]

■■ We turn now to a consideration of the petitioners' attack upon the findings of the Commission. We will, of course, set aside an order of the Commission if we find that it is not based upon findings of fact which are supported by substantial evidence.[16] But to the extent that the findings of the Commission are "supported by substantial evidence, [they are] conclusive".[17] In reviewing an order of the Commission, "this Court may not retry the controversy, substitute its judgment for that of the Commission as to any doubtful or debatable questions of fact, or reverse the challenged orders because the Commission has rejected the views of the State * * * as to what inferences should be drawn from the evidence. The Commission 'is the agency which weighs the relevance of factual data.' See National Labor Relations Board v. Stowe Spinning Co., 336 U.S. 226, 231, 69 S.Ct. 541, 545 [93 L.Ed. 638]." State of Iowa v. Federal Power Commission, 8 Cir., 1949, 178 F.2d 421, 427, certiorari denied 339 U.S. 979, 70 S.Ct. 1024, 94 L.Ed. 1383.

Petitioners concentrate their attack upon what we shall classify as two groups of findings:

1. The necessity of the dams to alleviate a power shortage in the Northwest.

2. The effect of the dams upon the fish runs in the Cowlitz River.

■■ First, as for the necessity of the dams: It is common knowledge that there was a power shortage in the Northwest in the winters of 1947–1948 and 1948–1949, and that the further expansion of other power facilities in the Northwest which Petitioners stress must be weighed against the continued growth of industrial activity in the area, and that in years of low rainfall the capacity of all hydroelectric plants is curtailed. And national defense is a prime element for the Commission's consideration. In short, an estimated necessity for electric energy, quantitatively speaking, must not be determined alone upon present demand projected into the future in accordance with normal circumstances. Paradoxically, abnormality is the normal of the day we live in.

The Cowlitz Project is but sixty miles from Tacoma, and will permit of a much shorter transmission distance than any of the other existing or proposed hydroelectric developments. And while steam electric plants can be built which would aid in Tacoma's electrical needs, we have no part in the decision which Tacoma has arrived at and which the Commission has agreed with as to the desirability of one source of electric energy over the other.[18] Nor can we weigh the benefits of flood control, improved navigation of the Cowlitz, and accessibility of recreational areas. There is substantial competent and persuasive evidence on these subjects.

We must now consider the fate of the fish on the Cowlitz River. Herein lies the chief concern of those who object to the construction of the dams. They contend that the project will destroy the runs of spring Chinook salmon, fall Chinook salmon, silver salmon, steelhead trout, cutthroat trout and smelt which use the Cowlitz as spawning grounds. They point out that to pass each of the

---

15a. See City of Tacoma v. Taxpayers, et al., No. 32,411, which is now pending before the Supreme Court of the State of Washington.

16. Pacific Power & Light Co. v. Federal Power Commission, 9 Cir., 1938, 98 F.2d 835, affirmed 307 U.S. 156, 59 S.Ct. 766, 83 L.Ed. 1180.

17. Section 313(b), Federal Power Act, Title 16 U.S.C.A. § 825l (b).

18. Because the electric energy plants of the northwestern states produce little or no energy beyond their every-day demands, the major systems have entered into a "power pool" by interconnecting their distributing lines. By this arrangement an unusual demand upon any one plant may be met by the transfer of energy from another plant. The City of Tacoma is an integral member of the "pool".

dams, the fish will have to climb ladders of three hundred twenty-five feet at Mossyrock, and one hundred eighty-five feet at Mayfield, each of which is considerably higher than the Bonneville Dam's ladder of sixty-seven feet, the highest dam over which migratory fish have been successfully passed to date.[19] They further argue that, even if some fish should manage to reach their spawning grounds above the dams, their number would be greatly depleted; and furthermore, the fingerlings, when hatched, would face the further task of avoiding destruction in the hydroelectric penstocks in their journey to the sea to mature and, in their time, to return in the mysterious cycle of perpetuating the species.

There is evidence that only one-half of the fish spawn above the dam sites, and elaborate plans are contemplated by the City and required by the Commission's order looking to the safe transmission of the fish to the spawning areas above the dams.

 As we see it, it is not within our jurisdiction to prescribe a policy. The Federal Government has the jurisdiction over navigable rivers and it is within the power of the Congress and the Executive to prescribe the policy in relation thereto. If the dams will destroy the fish industry of the river, we are powerless to prevent it. It is admitted that the fish industry on the river is an important one and every known method should be used to preserve it. If it is the law (and we are not holding one way or another) that the Commission is held to the use of discretion in its requirements as to the preservation of any use to which a navigable stream is currently being put, we hold that the Commission has given the subject of the

fishing industry due consideration and has not abused its discretion.

 There is ample evidence to sustain the Commission in the exercise of its judgment that the Cowlitz Project is "best adapted to a comprehensive plan [20] for improving or developing a waterway [i. e., the Cowlitz River] * * * for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes".[21] Title 16 U.S.C.A. § 803(a).

We decline to interfere with the Commission's order.

---

19. The McNary Dam, now nearing completion, will require migratory fish to climb about ninety feet by means of ladders.

20. The Federal Power Commission determined upon adequate evidence that the Lower Columbia River Fishery Plan is not inconsistent with the Federal Power Commission's plan for developing the Cowlitz River, since the license issued by

the Commission for the construction of the Cowlitz Project requires the applicant City of Tacoma to provide facilities for the protection of the fish which spawn in the Cowlitz River.

21. Cf. Finding No. 59 of the Commission, quoted supra as No. 24 of the summarized findings.