CITY OF TACOMA *v.* TAXPAYERS
OF TACOMA ET AL.

No. 509.   Argued April 30, 1958.—Decided June 23, 1958.

*Northcutt Ely* argued the cause for petitioner. With him on the brief were *Marshall McCormick, Paul J. Nolan, Robert L. McCarty, C. Emerson Duncan, II,* and *Charles F. Wheatley, Jr.*

By special leave of Court, 356 U. S. 916, *Oscar H. Davis* argued the cause for the United States and the Federal Power Commission, as *amici curiae,* urging reversal. *Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade, Lionel Kestenbaum, Willard D. Gatchell* and *Howard E. Wahrenbrock* filed a brief for the Federal Power Commission, as *amicus curiae,* urging reversal.

*John S. Lynch, Jr.* and *E. P. Donnelly,* Assistant Attorney General of Washington, argued the cause for respondents. *Mr. Lynch* filed a brief for the Taxpayers of Tacoma, Washington, respondents. With *Mr. Donnelly* on a brief were *John J. O'Connell,* Attorney General, and *Philip R. Meade,* Assistant Attorney General, for the State of Washington et al., respondents; and joining them in this brief were the States of Iowa, by *Norman A. Erbe,* Attorney General; Michigan, by *Paul L. Adams,* Attorney General; Montana, by *Forrest H. Anderson,* Attorney General; Nevada, by *Harvey Dickerson,* Attorney General; New Mexico, by *Fred M. Standley,* Attorney General; Vermont, by *Frederick M. Reed,* Attorney General; Virginia, by *A. S. Harrison, Jr.,* Attorney General; and Wisconsin, by *Stewart G. Honeck,* Attorney General, and *Roy G. Tulane* and *James H. McDermott,* Assistant Attorneys General.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

This is the latest episode in litigation beginning in 1948 which has been waged in five tribunals and has produced more than 125 printed pages of administrative and judicial opinions. It concerns the plan of the City of Tacoma, a municipal corporation in the State of Washington, to construct a power project on the Cowlitz River, a navigable water of the United States, in accordance with a

license issued by the Federal Power Commission under the Federal Power Act.[1] The question presented for decision here is whether under the facts of this case the City of Tacoma has acquired federal eminent domain power and capacity to take, upon the payment of just compensation, a fish hatchery owned and operated by the State of Washington, by virtue of the license issued to the City under the Federal Power Act and more particularly § 21 thereof.[2] The project cannot be built without taking the hatchery because it necessarily must be inundated by a reservoir that will be created by one of the project's dams.

The question has arisen under the following circumstances and proceedings. Having earlier filed its declaration of intention to construct the project,[3] the City of Tacoma, a "municipality" [4] in the State of Washington, on December 28, 1948, filed with the Commission, under

---

[1] 41 Stat. 1063 *et seq.*, 16 U. S. C. § 791a *et seq.*

[2] 41 Stat. 1074, 16 U. S. C. § 814.

[3] On August 6, 1948, the City filed with the Commission its declaration of intention to build this power project. On March 18, 1949, the Commission ruled that the Cowlitz River was navigable below the proposed project and that its construction would affect navigation and interstate commerce and, hence, could not be built without a license from the Commission, because of the provisions of § 23 of the Federal Power Act. 41 Stat. 1075, 16 U. S. C. § 816.

[4] " 'Municipality' [as used in the Federal Power Act] means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power." § 3 (7), 41 Stat. 1063, 16 U. S. C. § 796 (7).

By a Washington statute all cities and towns of that State are made legally competent to "construct, condemn and purchase, purchase, acquire, add to, maintain, and operate works, plants, and facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes . . . ." Wash. Rev. Code 80.40.050. Tacoma has exercised such powers since 1893.

§ 4 (e) of the Federal Power Act,[5] an application [6] for a federal license to construct a power project, including two dams (known as Mossyrock and Mayfield) and appurtenant facilities, on the Cowlitz River.[7]

The Mossyrock development was proposed to be located at Mile 65 and to consist of a concrete dam across the Cowlitz rising 510 feet above bedrock (creating a reservoir covering about 10,000 acres extending 21 miles upstream) and an integral powerhouse containing, initially, three generators each of 75,000-kilowatt capacity and provisions for a fourth generator of like capacity.

---

[5] 41 Stat. 1065, 16 U. S. C. § 797 (e). That subsection, so far as presently pertinent, provides:

"The commission is authorized and empowered—

.          .          .          .          .

"(e) To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the· laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, powerhouses, transmission lines, or other project works ·necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States . . . ."

[6] The application was accompanied by the maps, plans, specifications and estimates of cost covering the proposed project, as required by § 9 (a) of the Act. 41 Stat. 1068, 16 U. S. C. § 802 (a). Those maps, plans and specifications made clear that the State's hatchery would be inundated by the proposed Mayfield Reservoir.

[7] The Cowlitz River is a tributary of the Columbia in southwestern Washington. It drains an area of 2,490 square miles of the western slope of the Cascade Range, and flows westerly for about 100 miles and thence southerly for 30 miles to its confluence with the Columbia at Longview which is about 65 miles above the mouth of the Columbia. It is conceded to be navigable at all points below the projected Mayfield Dam and, at the point of confluence with the Columbia, is a tidal river with an average flow of about 10,000 cubic feet per second.

The Mayfield development was proposed to be located at Mile 52 and to consist of a concrete dam across the Cowlitz rising 240 feet above bedrock (creating a reservoir covering about 2,200 acres extending 13.5 miles upstream to the tailwaters of the Mossyrock Dam, which would inundate the State's fish hatchery) and an integral powerhouse containing, initially, three generators each of 40,000-kilowatt capacity and provisions for a fourth generator of like capacity. The project—estimated to cost $146,000,000, including $9,465,000 for devices to enable anadromous fish to pass to spawning grounds upstream and their young to pass to the sea, and for new fish hatcheries—would thus have initial capacity to produce 345,000 kilowatts or 474,000 horsepower, and eventually 460,000 kilowatts or 632,000 horsepower, of electrical energy.

The Commission ordered a public hearing to determine whether the license should issue, and gave notice of the hearing to the Governor of the State of Washington. In response, the Attorney General of the State filed an intervening petition, in the names of the State's Directors of Fisheries and of Game, alleging in substance that the State's Departments of Fisheries and of Game are subdivisions of the sovereign State, and that the respective Directors are charged with the duty of enforcing its laws concerning the conservation of fish and game; that the dams and fish-handling facilities proposed by the City would destroy fishery resources of the State; that construction of proposed dams would violate Wash. Rev. Code 90.28.060, requiring the State's permission to construct any dam for the storage of 10 acre-feet or more of water, and Wash. Rev. Code 75.20.010, prohibiting the construction of any dam higher than 25 feet across any river tributary to the Columbia, downstream from the McNary Dam, within the migratory range of anadromous fish; and "[t]hat the reservoirs which would be created by the pro-

posed dams would inundate a valuable and irreplaceable fish hatchery owned by the State of Washington, as well as . . . productive spawning areas." The City's answer admitted that the State's fish hatchery would be inundated by the Mayfield Reservoir. The State's Attorney General also appointed a Special Assistant Attorney General to represent all persons of the State whose views were in conflict with the State's official position.

Upon the issues thus framed a hearing, consuming 24 days, was conducted by a Commission examiner, throughout which the Attorney General of the State, by his designated assistant, actively participated in opposition to the application, and the Special Assistant Attorney General, appointed for the purpose stated, also participated in the proceedings before the Commission. Thereafter the Commission, on November 28, 1951, rendered its opinion,[8] findings,[9] and order granting the license.[10]  *Re City of*

---

[8] The Commission's opinion discussed at length the State's basic contention that the river should be left in its natural state for the unobstructed use and propagation of anadromous fish and, upon that contention, concluded:

"The question posed does not appear to us to be between all power and no fish but rather between large power benefits (needed particularly for defense purposes), important flood control benefits and navigation benefits, with incidental recreation and intangible benefits, balanced against some fish losses, or a retention of the stream in its present natural condition until such time in the fairly near future when economic pressures will force its full utilization. With proper testing and experimentation by the city of Tacoma, in co-operation with interested state and Federal agencies, a fishery protective program can be evolved which will prevent undue loss of fishery values in relation to the other values. For these reasons we are issuing the license with certain conditions which are set forth in our accompanying order." 92 P. U. R. (N. S.) 79, 85.

[9] In its order granting the license the Commission made 66 findings in which, among other things, it found that the Cowlitz is a navigable water of the United States below the site of the proposed project

*Tacoma,* 92 P. U. R. (N. S.) 79.   The State petitioned for a rehearing which was denied.

Pursuant to § 313 of the Act, 16 U. S. C. § 825*l*, the State, in its proper name and also on behalf of its Direc-

and that the dams and reservoirs will affect the interests of interstate or foreign commerce (see §§ 4 (e) and 23 of the Act, 41 Stat. 1065, 1075, 16 U. S. C. §§ 797 (e), 816) ;.that a critical shortage of electric‧ power exists on the west side of the Cascade Range; that the project "will be an exceptionally valuable addition to the Northwest Region power supply"; that "none of the hydroelectric projects suggested for construction in lieu of the Cowlitz Project can be constructed as quickly or as economically as the Cowlitz Project"; that the project has been approved by the Chief of Engineers and the Secretary of the Army (see § 4 (e), 41 Stat. 1065, 16 U. S. C. § 797 (e)) ; that the project is financially and economically feasible; that *"the Appli-cant . . . has submitted satisfactory evidence of compliance with the requirements of all applicable State laws insofar as necessary to effect the purposes of a license for the project* [see § 9 (b), 41 Stat. 1068, 16 U. S. C. § 802 (b)] and it is a municipality within the meaning of Section 3 (7) of the Act"; and that "[u]nder present circumstances and conditions and upon the terms and conditions hereinafter in-cluded in the license, *the project is best adapted to a comprehensive plan for improving or developing the waterway involved for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the conservation and preservation of fish and wildlife resources, and for other beneficial public uses including recreational purposes."* See § 10 (a), 41 Stat. 1068, 16 U. S. C. § 803 (a).   (Emphasis added.)

[10] The license was issued on November 28, 1951, for a period of 50 years from January 1, 1952—the first day of the month in which the City filed with the Commission its ordinance, No. 14386, enacted on January 9, 1952, formally accepting the license and all its require-ments and conditions.   See § 6, 41 Stat. 1067, 16 U. S. C. § 799. The license, among other things, incorporated the City's maps, plans, specifications, and estimates of cost for the construction of the project (see § 9 (a), 41 Stat. 1068, 16 U. S. C. § 802 (a)) ; incorporated by reference all provisions of the Federal Power Act (see § 6, 41 Stat. 1067, 16 U. S. C. § 799) ; required construction of the project to be commenced within two years from the effective date of the license and to be completed within 36 months (see § 13, 41 Stat. 1071, 16 U. S. C. § 806) ; required the City to construct, maintain and operate

tors of Fisheries and of Game, petitioned for review of the Commission's order by the Court of Appeals for the Ninth Circuit. The City intervened. The State there challenged the Commission's authority to issue the license principally upon the grounds that the City had not complied with applicable state laws nor obtained state permits and approvals required by state statutes; [11] that "Tacoma, as a creature of the State of Washington, *cannot act* in opposition to the policy of the State or in derogation of its laws" (emphasis added); and that the evidence was not sufficient to sustain the Commission's findings and order. The Court of Appeals, holding that "state laws cannot prevent the Federal Power Commission from issuing a license *or bar the licensee from acting under the license* to build a dam on a navigable stream since the stream is under the dominion of the United States" and that there was ample evidence to sustain the Commission's findings and its order, affirmed. *Washington Department of Game* v. *Federal Power Comm'n*, 207 F. 2d 391, 396. (Emphasis added.) The State then petitioned this Court for a writ of certiorari which was denied. 347 U. S. 936.

---

such fish-handling facilities and fish hatcheries as may be prescribed by the Commission, but, before doing so, to make further studies, tests and experiments in cooperation with the United States Fish and Wildlife Service and the Departments of Fisheries and of Game of the State of Washington to determine the effectiveness of such facilities, and to submit the plans therefor to the Commission and obtain its approval.

[11] The Washington statutes relied upon were Wash. Rev. Code 75.20.050, proscribing the diversion or use of water without a state permit; Wash. Rev. Code 75.20.100, requiring the State's approval of plans for the protection of fish in connection with the construction of dams; and Wash. Rev. Code 75.20.010, proscribing the construction of any dam higher than 25 feet across any stream tributary to the Columbia, downstream from the McNary Dam, within the migration range of anadromous fish.

While the petition for review was pending in the Ninth Circuit, the City, on February 3, 1952, commenced an action in the Superior Court of Pierce County, Washington, against the taxpayers of Tacoma and the State's Directors of Fisheries and of Game, seeking a judgment declaring valid a large issue of revenue bonds, authorized by the City's Ordinance (No. 14386) of January 9, 1952, to be issued and sold by Tacoma to finance the construction of the Cowlitz project—a proceeding specifically authorized by Wash. Rev. Code 7.25.010 through 7.25.040. As required by those statutes the court named representative taxpayers of Tacoma as class defendants and also appointed their counsel who demurred to the City's complaint. The State's Directors of Fisheries and of Game, acting through an Assistant Attorney General of the State, filed an answer and also a cross-complaint (reasserting substantially the same objections that they and the State had made before the Commission, and that had been made in, and rejected by, the Court of Appeals on their petition for review) to which the City demurred. The judge of the Superior Court sustained the Taxpayers' demurrer and dismissed the suit.[12] Tacoma appealed to the Supreme Court of Washington. That court, three justices dissenting, reversed the judgment and remanded the cause with instructions to overrule the Taxpayers' demurrer and to proceed further consistently with the court's opinion. *City of Tacoma* v. *Taxpayers of Tacoma,* 43 Wash. 2d 468, 262 P. 2d 214.[13]

---

[12] This order was entered by the Superior Court of Thurston County to which the cause had been transferred.

[13] The court, in answering the contentions of the Taxpayers and the State's Directors of Fisheries and of Game that the State's statutes proscribing the diversion of water and the construction of dams (see note 11) "are a valid exercise of the [State's] police power" (43 Wash. 2d, at 483, 262 P. 2d, at 222) and "must be complied with before [the City] can proceed with the construction of its project"

Following that opinion the City, on June 21, 1955, accepted bids for a block of its revenue bonds totaling $15,000,000, and on the next day it awarded contracts for construction of the Mayfield Dam aggregating $16,120,870. Two days later, June 24, 1955, the Directors "acting for and on behalf of the State" moved in the Superior Court for, and obtained, *ex parte,* an order enjoining the City, pending determination of the suit, from proceeding to construct the Cowlitz project or to sell any of its revenue bonds. That order was modified on June 30, 1955, to permit such construction work as would not in any manner interfere with the bed or waters of the Cowlitz River. Promptly thereafter the City began construction of the project, within the limits of the injunction, and had expended about $7,000,000 thereon to the time the work was completely enjoined as later stated.

On July 27, 1955, Tacoma amended its complaint merely to assert the intervening facts that the Commis-

---

(43 Wash. 2d, at 477, 262 P. 2d, at 219), said: "[T]hese state laws are in direct conflict with the Federal power act, they are invalid under the terms of the supremacy clause contained in article VI of the United States Constitution, [and] [w]here, as here, the state and Federal acts cannot be reconciled or consistently stand together, the action of a state even under its police power must give way." 43 Wash. 2d, at 483, 262 P. 2d, at 222. And in answering the further contention that the City, "being a municipal corporation created by the state, may not defy the laws of its creator" (43 Wash. 2d, at 491, 262 P. 2d, at 227), the court said: "The Federal power act defines the term municipal corporation and authorizes the power commission to issue a license to such an entity. *Appellant has complied with the state law with respect to the right of a municipality to engage in the business of developing, transmitting and distributing power. Having been granted a license by the power commission, we hold that appellant is at the present time in the same position as any other licensee under the act."* 43 Wash. 2d, at 492, 262 P. 2d, at 227. (Emphasis added.)

sion, upon application of the City which was opposed by the State, had, on the basis of delays entailed by this litigation, entered an order on February 24, 1954, amending Articles 28 and 33 of the City's license by extending the time for commencing and for completing the project to December 31, 1955, and December 31, 1958, respectively, and that the City had amended its pertinent ordinance (No. 14386) accordingly and in other minor respects. On August 8, 1955, on motion made by the State's Attorney General (in the names of the Directors of Fisheries and of Game), the State, "in its sovereign capacity," was formally made a defendant in the action. The State and those Directors answered, and also filed a cross-complaint again reviving the objections previously made by the Directors in their earlier cross-complaint and alleging further that the project would interfere with navigation of the Cowlitz River in violation of Wash. Rev. Code 80.40.010. Upon pretrial conference the Superior Court found that the navigation issue was the only one open and ordered that the evidence at the trial be limited to that issue. On January 11, 1956, the case was tried and the testimony taken was limited solely to the navigation issue. On March 6, 1956, the court, holding that the State's statutes proscribing the construction of dams (note 11) are "inapplicable," but that the City "is acting illegally and in excess of its authority in the construction of the . . . project as presently proposed for the reason that said project would necessarily impede, obstruct or interfere with public navigation contrary to the proviso of R. C. W. 80.40.010 et seq.," entered judgment in favor of the Taxpayers and the State, and enjoined the City from proceeding to construct the project.

Tacoma appealed, and the Taxpayers, the State and its Directors cross-appealed, to the Supreme Court of Wash-

ington. On February 7, 1957, that court,[14] three justices dissenting, affirmed. *City of Tacoma* v. *Taxpayers of Tacoma*, 49 Wash. 2d 781, 307 P. 2d 567. It agreed that the Washington statutes proscribing the construction of dams (note 11) were "inapplicable . . . insofar as the same conflict with the provisions of the Federal Power Act or the terms and conditions of [the City's] License for said project, or insofar as they would enable State officials to exercise a veto over said project" (49 Wash. 2d, at 801, 307 P. 2d, at 577), but it disapproved the action of the trial court in sustaining the State's objection that the project would interfere with navigation in violation of Wash. Rev. Code 80.40.010. However, upon the declared premise that though the trial court's judgment was based upon an erroneous ground it would sustain it if correct on any ground within the pleadings and established by proof, it held that, though the State Legislature has given the City the right to construct and operate facilities for the production and distribution of electric power and a general power of condemnation for those purposes, "the legislature has [not] expressly authorized a municipal corporation to condemn state-owned land previously dedicated to a public use [and] that the city of Tacoma has not been endowed with [State] statutory capacity to condemn [the State's fish hatchery]"; that "the city of Tacoma [may not] receive the power and capacity to condemn [the State's fish hatchery] previously dedicated to a public use, from the license issued to it by the Federal power commission in the absence of such power and capacity *under state statutes*" (emphasis

---

[14] The Supreme Court of Washington was then somewhat differently constituted than when it rendered its decision on October 14, 1953, reversing the Superior Court's judgment sustaining the Taxpayers' demurrer to the City's complaint. *City of Tacoma* v. *Taxpayers of Tacoma*, 43 Wash. 2d 468, 262 P. 2d 214.

added); and that the City's *"inability so to act can be remedied only by state legislation that expands its capacity."* (Emphasis in original.) 49 Wash. 2d, at 798, 799, 307 P. 2d, at 576, 577. This, it said, "is not a question of the right of the Federal government to control all phases of activity on navigable streams, nor a question of its power, under the Federal power act, to delegate that right. It only questions the capacity of a municipal corporation of this state *to act under such license* when its exercise requires the condemnation of state-owned property dedicated to a public use." 49 Wash. 2d, at 798, 307 P. 2d, at 576. (Emphasis added.) We granted certiorari. 355 U. S. 888.

At the outset respondents ask dismissal of our writ on the ground that the case is moot. They argue that it is evident the Cowlitz project cannot be completed by December 31, 1958, which is the date now stated in the license for its completion. There is no merit in this contention because § 13 of the Federal Power Act, 41 Stat. 1071, 16 U. S. C. § 806, expressly provides that "the period for the completion of construction carried on in good faith and with reasonable diligence may be extended by the Commission when not incompatible with the public interests," and an application by the City is now pending before the Commission for an extension of completion time based upon delays entailed by these proceedings.

We come now to the core of the controversy between the parties, namely, whether the license issued by the Commission under the Federal Power Act to the City of Tacoma gave it capacity to act under that federal license in constructing the project and delegated to it federal eminent domain power to take, upon the payment of just compensation, the State's fish hatchery—essential to the construction of the project—in the absence of state legislation specifically conferring such authority.

At the threshold of this controversy petitioner, the City, asserts that, under the express terms of § 313 (b) of the Act, 16 U. S. C. § 825*l* (b), this question has been finally determined by the decision of the Court of Appeals (207 F. 2d 391) and this Court's denial of certiorari (347 U. S. 936); and that respondents' cross-complaints, and proceedings thereon, in the subsequent bond validation suit in the Washington courts have been only impermissible collateral attacks upon the final judgment of the Court of Appeals. If this assertion is correct, the judgment of the Supreme Court of Washington now before us would necessarily have to be reversed, for obviously that court, like this one, may not, in such a case, re-examine and decide a question which has been finally determined by a court of competent jurisdiction in earlier litigation between the parties. We must turn then to an examination of petitioner's contention.

It is no longer open to question that the Federal Government under the Commerce Clause of the Constitution (Art. I, § 8, cl. 3) has dominion, to the exclusion of the States, over navigable waters of the United States. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196; *New Jersey* v. *Sargent,* 269 U. S. 328, 337; *United States* v. *Appalachian Electric Power Co.,* 311 U. S. 377, 424; *First Iowa Hydro-Electric Cooperative* v. *Federal Power Comm'n,* 328 U. S. 152, 173; *United States* v. *Twin City Power Co.,* 350 U. S. 222, 224–225. Congress has elected to exercise this power under the detailed and comprehensive plan [15] for development of the Nation's water resources, which it prescribed in the Federal Power Act, to be administered by the Federal Power Commission. *First Iowa Hydro-Electric Cooperative* v. *Federal Power Comm'n, supra; United States* v. *Appalachian Electric Power Co., supra.*

---

[15] For a summary of the detailed and comprehensive plan of the Act see *First Iowa* case, *supra,* at 181, note 25.

Section 313 (b) of that Act, upon which petitioner's claim of finality depends, provides, in pertinent part:

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located . . . by filing in such court, within 60 days after the order of [the] Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be served upon any member of the Commission and thereupon the Commission shall certify and file with the court a transcript of the record upon which the order complained of was entered. Upon the filing of such transcript such court *shall have exclusive jurisdiction to affirm, modify, or set aside such order in whole or in part.* No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. . . . *The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 346 and 347 of Title 28.*" 16 U. S. C. § 825*l* (b). (Emphasis added.)

This statute is written in simple words of plain meaning and leaves no room to doubt the congressional purpose

and intent. It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had. Cf. *Labor Board* v. *Cheney California Lumber Co.*, 327 U. S. 385, 388. So acting, Congress in § 313 (b) prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders. *Safe Harbor Water Power Corp.* v. *Federal Power Comm'n*, 124 F. 2d 800, 804, cert. denied, 316 U. S. 663. It there provided that any party aggrieved by the Commission's order may have judicial review, upon all issues raised before the Commission in the motion for rehearing, by the Court of Appeals which "shall have exclusive jurisdiction to affirm, modify, or set aside such order in whole or in part," and that "[t]he judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, *shall be final*, subject to review by the Supreme Court of the United States upon certiorari or certification . . . ." (Emphasis added.) It thereby necessarily precluded *de novo* litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review.[16] Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all. For Congress, acting within its powers, has declared that the Court of Appeals shall have "exclusive jurisdiction" to review such orders, and that its judgment "shall be final," subject to review by this Court upon certiorari or certification. Such statutory finality need not be labeled *res*

---

[16] Cf., *e. g.*, *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 48–50; *United States* v. *Corrick*, 298 U. S. 435; *Washington Terminal Co.* v. *Boswell*, 75 U. S. App. D. C. 1, 124 F. 2d 235.

*judicata,* estoppel, collateral estoppel, waiver or the like either by Congress or the courts.

The State participated in the hearing before the Commission. It there vigorously objected to the issuance of the license upon the grounds, among others, "[t]hat the reservoirs which would be created by the proposed dams would inundate a valuable and irreplaceable fish hatchery owned by the State" and, hence, necessarily require the taking of it by the City under the license sought; that the City had not complied with the applicable laws of the State respecting construction of the project and performance of the acts necessarily incident thereto (note 11); and that the City was not authorized by the laws of the State to engage in such business. The Commission rejected these contentions of the State and made all the findings required by the Act to support its order granting the license (note 9) including the finding that:

> "The Applicant . . . has submitted satisfactory evidence of compliance with the requirements of all applicable State laws insofar as necessary to effect the purposes of a license for the project; [17] and it is a municipality within the meaning of Section 3 (7) of the Act." [18]

---

[17] See § 9 (b) of the Act, 41 Stat. 1068, 16 U. S. C. § 802 (b).

[18] Under § 3 (7) of the Act "municipality" means, among other things, a city "competent under the laws [of the State] to carry on the business of developing, transmitting, utilizing, or distributing power." 41 Stat. 1063, 16 U. S. C. § 796 (7). It is no longer disputed that Tacoma is expressly authorized by Wash. Rev. Code 80.40.050 to carry on such business, and that it has done so for many years. In fact the State's brief in this Court goes much further, saying that "[i]mplicit in the state court's ruling is that petitioner, if licensed, could build a dam on a plan which would not necessitate the destruction of the state fish hatchery," and that "Tacoma . . . has the right to build the dam in such a way that the fish hatchery will not be damaged."

The State then petitioned the Commission for a rehearing, reviving the foregoing contentions and raising others. The petition was denied.

Thereafter, the State, following the procedures prescribed by § 313 (b), petitioned the proper Court of Appeals for review of the Commission's findings and order. After full hearing, that court rejected all contentions there raised by the State, did not disturb any of the Commission's findings, and affirmed its order without modification. *Washington Department of Game* v. *Federal Power Comm'n*, 207 F. 2d 391. It made particular mention of, and approved, the Commission's finding, as rephrased by the court, that the City had submitted "such evidence of compliance with state law as, in the Commission's judgment, would be 'appropriate to effect the purposes of a Federal license on the navigable waters of the United States.'" *Id.*, at 396.

Moreover, in its briefs in the Court of Appeals, the State urged reversal of the Commission's order on the grounds that the City "has not shown, nor could it show, that [it] has availed itself of . . . *any right to take or destroy the property of the State* of Washington [and that] Tacoma, as a creature of the State of Washington, *cannot act* [under the license] in opposition to the policy of the State or in derogation of its laws." (Emphasis added.) In rejecting these contentions—that the City does not have "any right to take or destroy property of the State" and "cannot act" in accordance with the terms of its federal license—the Court of Appeals said:

> "Again, we turn to the First Iowa case, supra. There, too, the applicant for a federal license was a creature of the state and the chief opposition came from the state itself. Yet, the Supreme Court permitted the applicant to act inconsistently with

the declared policy of its creator, and to prevail in obtaining a license.

"Consistent with the First Iowa case, supra, we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license *or bar the licensee from acting under the license* to build a dam on a navigable stream since the stream is under the dominion of the United States." *Id.,* at 396. (Emphasis added.)

We think these recitals show that the very issue upon which respondents stand here was raised and litigated in the Court of Appeals and decided by its judgment. But even if it might be thought that this issue was not raised in the Court of Appeals, it cannot be doubted that it could and should have been, for that was the court to which Congress had given "exclusive jurisdiction to affirm, modify, or set aside" the Commission's order. And the State may not reserve the point, for another round of piecemeal litigation, by remaining silent on the issue while its action to review and reverse the Commission's order was pending in that court—which had "exclusive jurisdiction" of the proceeding and whose judgment therein as declared by Congress "shall be final," subject to review by this Court upon certiorari or certification. After the Court of Appeals' judgment was rendered, the State petitioned this Court for a writ of certiorari which was denied. 347 U. S. 936.

These were precisely the proceedings prescribed by Congress in § 313 (b) of the Act for judicial review of the Commission's findings and order. They resulted in affirmance. That result, Congress has declared, "shall be final."

But respondents say that the Court of Appeals did not decide the question of legal capacity of the City to act

under the license and, therefore, its decision is not final on that question, but left it open to further litigation. They rely upon the following language of the opinion:

"However, we do not touch the question as to the legal capacity of the City of Tacoma to initiate and act under the license once it is granted. There may be limitations in the City Charter, for instance, as to indebtedness limitations. Questions of this nature may be inquired into by the Commission as relevant to the practicability of the plan, but the Commission has no power to adjudicate them." *Id.*, at 396–397.

We believe that respondents' construction of this language is in error. The questioned language expressly refers to possible "indebtedness limitations" in the City's Charter and "questions of this nature," not to the right of the City to receive and perform, as licensee of the Federal Government under the Federal Power Act, the federal rights determined by the Commission and delegated to the City as specified in the license. That this was the meaning of the court, if its meaning might otherwise be doubtful, is made certain by the facts that the court did not disturb a single one of the Commission's findings; affirmed its order without modification; and said, in the sentence immediately preceding the questioned language: "Consistent with the First Iowa case, *supra,* we conclude that the state laws cannot prevent the Federal Power Commission from issuing a license *or bar the licensee from acting under the license* to build a dam on a navigable stream since the stream is under the dominion of the United States." *Id.*, at 396. (Emphasis added.)

The final judgment of the Court of Appeals was effective, not only against the State, but also against its citizens, including the taxpayers of Tacoma, for they, in their

common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment. *Wyoming* v. *Colorado,* 286 U. S. 494, 506–509; cf. *Missouri* v. *Illinois,* 180 U. S. 208, 241; *Kansas* v. *Colorado,* 185 U. S. 125, 142; s. c. 206 U. S. 46, 49; *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237; *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 355; *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 591, 595; *North Dakota* v. *Minnesota,* 263 U. S. 365, 373.

We conclude that the judgment of the Court of Appeals, upon this Court's denial of the State's petition for certiorari, became final under § 313 (b) of the Act, and is binding upon the State of Washington, its Directors of Fisheries and of Game, and its citizens, including the taxpayers of Tacoma; and that the objections and claims to the contrary asserted in the cross-complaints of the State, its Directors of Fisheries and of Game, and the Taxpayers of Tacoma, in this bond validation suit, were impermissible collateral attacks upon, and *de novo* litigation between the same parties of issues determined by, the final judgment of the Court of Appeals. Therefore, the judgment of the Supreme Court of Washington is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE HARLAN, concurring.

I join the Court's opinion, but deem it appropriate to state my understanding of what the Court has held. The Court of Appeals in the earlier proceeding had jurisdiction to determine whether state or federal law governed Tacoma's power to condemn the State's hatchery, and that issue itself was a federal question. Section 313 (b) of the Federal Power Act therefore foreclosed relitigation

of this issue in the present case. I do not understand the Court to suggest that the Federal Power Act endowed the Commission and the Court of Appeals with authority to decide any issues of state law if such law were deemed controlling, or that had the Court of Appeals undertaken to do so, such a determination would have foreclosed re-examination of such a decision in other proceedings.