ROLAND L. BELSOME, Judge.
11 Plaintiffs/appellants, Oscar Russell and Charles Shaw, appeal the trial court’s grant of Hibernia Bank and Hibernia Corporation’s motion for summary judgment. The trial court granted defendants’ motion and dismissed plaintiffs’ suit on the grounds that plaintiffs’ claims constituted an impermissible collateral attack on a federal agency’s prior ruling, which lies outside the jurisdiction of that court.
FACTS
Oscar Russell and Charles Shaw are former executive officers of Hibernia National Bank (“the Bank”). Russell and Shaw signed employment agreements (“Employment Agreements”) with the Bank and the Hibernia Corporation (“the Corporation”), a bank holding company. The Employment Agreements included generous severance packages, or “golden parachutes,” that would be paid if the officers were dismissed without cause. The Employment Agreements are the subject of the current dispute.
Shaw joined the Bank in 1973 and was elected to the Bank Board in 1985. He became Bank President and was elected to the Corporate Board in 1988, and he received a generous employment agreement. The Executive Compensation Committee of the Board set the terms of the contract.[1] His contract was for a three |2year term and provided that in the event of termination, actual or constructive, without cause, or due to change in control, he would be entitled to “a golden parachute,” i.e. the balance of the amount due for the remaining term of his contract.
Oscar Russell also received a similar contract. Russell was a vice-chairman of the Corporation and the Bank, and his job was to oversee the operational side of the Bank.
In 1991, the Office of the Comptroller of the Currency (“the OCC”), the regulatory body that oversees national banks, began investigating the Bank for what it perceived to be unsound banking practices. The OCC District Administrator, John *455 Bodnar, began to review the validity of the Employment Agreements. On June 3, 1991, in a letter to the Bank’s executive officers, Bodnar declared that the Employment Agreements violated national banking laws and ordered the Bank to rescind the contracts. Specifically, Mr. Bodnar determined that the contracts violated 12 U.S.C. § 24, Fifth, which mandates that banks must be allowed to fire officers at their pleasure.[2]
Bodnar declared the Employment Agreements invalid in a letter to the Hibernia Bank Board of Directors dated June 3, 1991 (“the Bodnar Letter”). Bod-nar determined that the Employment Agreements prohibited “the removal of the executive officers except for cause, thereby curtailing the statutory right of the Bank’s Board to hire and fire executive officers at will,” in violation of 12 U.S.C. § 24, Fifth. Bodnar also determined that the Employment Agreements violated many federal regulations. 12 C.F.R. § 7.5220 permits national banks to enter into | aemployment contracts so long as they contain “reasonable terms and conditions.” The “golden parachute” provisions violated this regulation according to the Bodnar Letter because they were “not consistent with national banking laws, thus they are per se unreasonable.” The Employment Agreements were also found to violate federal regulations governing profit sharing plans, pension plans, stock options, and indemnification of officers for costs associated with regulatory investigations.[3]
On June 13, 1991, the OCC sent a letter to Shaw informing him that his contract was invalid. These two letters are collectively known as the “Bodnar Letters.” Soon after the arrival of the Bodnar Letters, both Russell and Shaw signed Termination Agreements. On July 20, 1991, Shaw and Russell signed a letter (“the Termination Agreement”) indicating that they were voluntarily resigning on July 31, 1991, and that they were accepting severance benefits limited to six-months salary and miscellaneous other benefits.
All parties disagree about the significance of the OCC directives contained in the Bodnar Letters. Shaw and Russell contend the directives in the Bodnar Letters were merely recommendations from the OCC that could have been appealed or disobeyed without consequence. Hibernia Bank and Hibernia Corporation contend that the directives were final agency action that can only be appealed in federal court, and that it had no choice but to obey the OCC’s orders to rescind the contracts.
Shaw and Russell further contend that the OCC determinations were clearly incorrect, that they were the product of the Bank Board’s surreptitious advocacy to have the contracts deemed unenforceable, and that the Board should have appealed the corresponding directives on their behalf. For these reasons, Shaw and Russell |4now claim that they signed the Termination Agreements out of mistake, since both parties believed the Employment Agreements were invalid when they actually were valid. Alternatively, they claim that they signed away their rights to substantial severance pay as the result of fraud and duress.[4] Either way, they seek to rescind the Termination Agreements and to enforce the Employment Agreements.
*456 PROCEDURAL HISTORY
In May of 1994, Russell filed suit against the Corporation, claiming improper rescission and breach of his employment agreement, and seeking liquidated damages. On July 22, 1996, Shaw filed a similar suit against the Corporation and the Bank. The suits were filed in the Civil District Court for the Parish of Orleans, and because the factual circumstances of both cases were nearly identical, the cases were consolidated for purposes of discovery. The cases were removed to federal court by the defendants on August 20, 1996, but remanded to state court on October 10, 1996. On May 11, 1999, Hibernia[5] filed and was granted a motion for summary judgment on the grounds the Termination Agreement was valid and there were no genuine issues of material fact. This court reversed the trial court, holding that granting the motion for summary judgment was premature, and remanded the case for additional discovery.
On January 21, 2004, defendants filed another motion for summary judgment seeking a determination that Bodnar’s Letters of June 3 and June 13, 1991 were “final agency action” and that Shaw and Russell’s suits were an impermissible “collateral attack” on those rulings. Shaw opposed and filed his cross motion for summary judgment claiming that the Bod-nar Letters were mere |s“moral suasion,” not final agency action, and seeking a determination of the legal effect of the Termination Agreement or its rescission under Louisiana state law. The court below granted the defendants’ motion and denied plaintiffs’ cross motion.
In the trial court’s own words:
It is undisputed that the district administrator of the Office of the Comptroller of the Currency ordered that the contract be terminated and rescinded as unlawful ...
Reviewing the Plaintiffs statement of contested facts in opposition to Defendant’s motion for summary judgment shows that Plaintiff challenges the appropriateness of the OCC determination. A successful challenge of the OCC’s ruling is necessary to render Plaintiff relief he seeks.
This Court agrees with Defendant that Plaintiffs claim constitutes an impermissible collateral attack on a prior order of a federal agency, which lies outside the jurisdiction of this Court.
Plaintiffs’ appeal is now before us.
ASSIGNMENTS OF ERROR
The parties assert the following errors by the Court below: the district court erred in granting Summary Judgment on the holding that the Bodnar Letters were final agency OCC action and Shaw’s suit an impermissible collateral attack on a pri- or Agency’s ruling; further, the district court erred in denying Shaw’s Cross Motion for Summary Judgment and in failing to hold that the Bodnar Letters were mere “moral suasion,” not final agency action, and that Shaw’s suit merely seeks to determine the legal effect of the Termination Letter.
STANDARD OF REVIEW
Appellate courts review summary judgments de novo, using the same criteria that governs the trial court’s consideration of whether summary judgment is | ^appropriate. Richard v. Hall, 2003-1488, p. 4 (La.4/23/04), 874 So.2d 131, 137. Summary judgment shall be rendered if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. La.Code Civ. Pro. art. 966(B).
*457 A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. If the court finds that a genuine issue of material fact exists, summary judgment must be rejected. Oakley v. Thebault, 96-0937 (La.App. 4 Cir. 11/18/96), 684 So.2d 488, 490.
LAW AND ANALYSIS
Shaw claims that the collateral attack rule, which bars preemptive attempts to bypass the specific methods Congress has provided for reviewing agency action, is not implicated here, and does not preclude state law actions respecting contracts however much they may have been influenced by the opinions of employees of federal agencies. Shaw also argues that the OCC only takes final agency action when it issues a notice of charges and fixes a date for formal hearing to determine whether a cease and desist order should issue, thus the Bodnar Letters were not final agency action.
Suits against third parties are impermissible collateral attacks where the heart of the suit necessitates an attack on agency decision. We believe this case is analogous to Caribou Four Corners, Inc. v. American Oil Co., 628 F.Supp. 363, 371-72 (D.Utah 1985). The court in Caribou held that a suit by private oil |7refinery against other participants in Department of Energy’s entitlements program was actually a premature challenge to agency action, despite being based upon various state common-law theories, and could not be maintained without exhaustion of administrative remedies. Caribou, 628 F.Supp. at 373. Here, if appellants were allowed to sue to enforce a contract deemed illegal by the Bank’s supervising agency, it would allow them to challenge the OCC’s determination without exhausting the appropriate federal remedies.
It is settled “that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had.” City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 336, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958). The United States Congress granted a limited waiver of sovereign immunity in the Administrative Procedures Act, 5 U.S.C. § 701 et seq., specifically allowing direct judicial review of federal agency actions. The APA vests exclusive subject matter jurisdiction over these matters to the federal courts.
Pursuant to the APA, any person “adversely affected or aggrieved” by “final action” of a federal agency may challenge that action in federal court in accordance with the procedures set forth in the act.
There is evidence that the Bodnar Letters may not have been final agency action. However, if they were not final agency action, there were review mechanisms available through the OCC itself. Thus, no matter how the Bodnar Letters are ultimately characterized (i.e., “final,” or “not final”), a state court does not have subject matter jurisdiction to review the appropriateness of the determination contained in those letters.
| sRussell and Shaw point out that many state courts since 1990 have agreed that the National Banking Act does not serve as a bar to the enforcement of severance provisions of employment agreements between banks and their executives.[6] Courts *458 in several states have upheld the validity of the severance pay provisions contained in employment agreements between executive banking officers and their employers, and found them not to be in violation of the National Banking Act’s mandate that banks be able to dismiss these officers at any time, with or without cause.[7]
In Citizens Nat’l Bank and Trust Co. v. Stockwell, 675 So.2d 584, 586-87 (Fla. 1996), the Supreme Court of Florida pointed out the unfairness of allowing a bank not to pay agreed-upon severance benefits. First, the Court distinguished between a suit for wrongful termination (which violates the National Banking Act) and a breach of contract claim to pay severance benefits (which is permitted). It then stated that a bank:
“cannot have the proverbial cake and eat it too. We do not read the National Bank Act to permit national banks to hold out lucrative contractual provisions in order to entice officers to work for them, and 19then hide behind a tenuous interpretation of the Act to get out of those provisions when they no longer need the officers.” Stockwell at 587.
The Stockwell court then held that the “golden parachute” provisions were enforceable. Stockwell at 586.
Here, the Bank was also free to enter into contracts for employment without agreeing to payment of severance benefits on termination. But, the Bank expressly agreed that if it chose to terminate its officers, it would pay them certain severance benefits. Hibernia Bank “voluntarily used the promise of those benefits as one bargaining tool to secure” the employment of Shaw and Russell during the years before they resigned or were fired. Stock-well at 587. Because there was no limitation on the power of the Bank to remove its officers, the enforcement of the severance pay provisions is completely consistent with the National Bank Act.
*459 Unfortunately for Appellants, this case is distinguishable from the cases listed above. Like the cases above, Russell and Shaw had employment agreements with the Bank and the Corporation, and these agreements contained “golden parachutes.” But in this case, the OCC investigated the Bank and explicitly held that the contracts violated provisions of the National Banking Act and federal banking regulations and ordered the Bank to immediately rescind the contracts, which it did.
Ultimately the appellants seek a declaration of the appropriateness of the Bod-nar Letter’s determinations, and a federal court or the OCC must make this determination.[8] For these reasons, we affirm the trial court’s grant of summary 11 (judgment to defendants/appellees on grounds that Plaintiff Shaw’s suit against the Bank was an impermissible collateral attack on a federal agency determination.
Russell and Shaw’s claims against the Corporation are different than Shaw’s claim against the Bank. In this case, the Bank (subject to regulation by the Office of the Comptroller and Currency under the National Banking Act[9]) and the Corporation (subject to regulation by the Federal Reserve System under the Bank Holding Company Act[10]) entered into an employment agreement with two of the Bank’s officers, Shaw and Russell. The OCC has no jurisdiction over the Corporation, and 12 U.S.C. § 24, Fifth, does not apply to bank holding companies. Therefore, although Shaw’s claim against the Bank may not be brought in state court, Shaw and Russell’s claims against the Corporation are valid state law contract claims.
A Michigan appellate court entertained a similar dispute in Ambro v. American National Bank and Trust Co. of Michigan, 152 Mich.App. 613, 394 N.W.2d 46 (1986). There, a former senior vice-president of a national bank brought a wrongful discharge action against a national bank and a bank holding company. The court held that the National Bank Act precluded the senior vice-president from maintaining a wrongful discharge suit against the national bank. Ambro at 618, 394 N.W.2d 46. However, the Ambro court also held that the senior vice-president could maintain his suit against the bank holding company. Ambro at 619, 394 N.W.2d 46. The court reasoned that state law was not preempted with respect to employment practices of bank holding companies because,
“(t)he National Bank Act does not govern national holding companies. The National Bank Holding Company Act, 12 U.S.C. § 1841 et seq., does not contain a provision similar to § 24 of the National Bank Act. InThus, we do not believe state law is preempted with respect to employment practices of bank holding companies.” Ambro at 619, 394 N.W.2d 46.
We agree, and hold that Shaw and Russell’s claims against the Corporation do not *460 constitute collateral attacks on any federal agency ruling, and may stay in state court.
The trial court erred in holding that Appellants’ claims against the Corporation constituted impermissible collateral attacks on the prior ruling of a federal agency. Appellants’ claims against the Corporation, which is not governed by the OCC, do not constitute impermissible collateral attacks on the OCC’s rulings. These claims are valid state law contract claims. However, Shaw’s claim against the Bank is an impermissible collateral attack on the OCC’s rulings. Therefore, the claims against the Corporation may stay in state court, and Shaw’s claim against the Bank must be brought in a more appropriate venue.
CONCLUSION
For the reasons stated above, we reverse the trial court’s rulings dismissing Appellants Shaw and Russell’s claims against Hibernia Corporation and remand for further proceedings. We further affirm the trial court’s ruling dismissing Appellant Shaw’s suit against Hibernia Bank.
DECREE
REVERSED IN PART AND REMANDED; AFFIRMED IN PART.
MURRAY, dissenting in part with reasons.

. The terms of Shaw's contract, including the golden parachute provision, were disclosed in the proxy material published in connection with his nomination to the Board of the Corporation in 1988, and then again in 1991. On each occasion, Shaw was duly elected, the last at the Shareholders meeting of April 30, 1991. At the April 30, 1991, shareholders meeting, the Board of Hibernia Corporation convened and Shaw was re-elected to the Board of the Bank. At the Bank Board meeting held later that day, Shaw was re-elected to the Presidency of the Bank.

. Appellants argue that this determination was clearly incorrect, and that it did not constitute final agency action.

. 12 C.F.R. §§ 7.5000; 7.5010; 7.5015; and 7.5217.

. Alternatively, Shaw also contends that he was constructively terminated before he signed the Termination Agreement on May 23’ 1991' when ⅛ W3S Sfripped °f ⅛ ⅛⅛8'

. Shaw sued both the Bank and the Corporation; Russell sued only the Corporation.

. Until the 1990’s, most state courts held that the National Banking Act prohibited Banks from paying dismissed executives generous severance packages known as “golden para *458 chutes” that had been negotiated for in the contract. In Copeland v. Melrose Nat’l Bank of New York, the court held that forcing banks to pay severance pay provisions of employment agreements violated the National Bank Act's provision that allows banks to dismiss officers at its pleasure. Copeland, 229 App. Div. 311, 241 N.Y.S. 429, aff'd. 254 N.Y. 632, 173 N.E. 898 (1930). Many states followed this reasoning and held that contract claims by dismissed bank officers are not allowed under the National Banking Act. See e.g., Mackey v. Pioneer Nat’l Bank, 867 F.2d 520 (9th Cir.1989); Alfano v. First Nat’l Bank of Highland, 111 A.D.2d 960, 490 N.Y.S.2d 56, 58 (1985); McGeehan v. Bank of New Hampshire Nat’l Asso’n., 123 N.H. 83, 455 A.2d 1054, 1055 (1983); Kemper v. First Nat’l Bank in Newton 94 Ill.App.3d 169, 49 Ill.Dec. 799, 418 N.E.2d 819 (1981).
However, beginning in 1990, some courts began to break away from Copeland and its progeny. The court in Schmidt v. Park Ave. Bank, N.A. held that not allowing dismissed executives to enforce severance agreements was inconsistent with the new federal regulations that allowed banks "to enter into employment contracts with its officers and employees upon reasonable terms and conditions.” 147 Misc.2d 1043, 558 N.Y.S.2d 779 (Sup.Ct.1990), citing 12 C.F.R. § 7.5220.

. In Kerndt v. Rolling Hills Nat’l Bank, the Iowa Supreme Court held that a contractual provision providing for compensation in the event of termination without cause does not violate the National Bank Act and thus is enforceable. 558 N.W.2d 410 (Iowa 1997). In Citizens Nat’l Bank and Trust Co. v. Stockwell, the Florida Supreme Court held that contractual severance provisions do not undermine the National Bank Act's purpose. 675 So.2d 584, 586-87 (Fla. 1996). In Ewert v. Drexel Nat’l Bank, a district court in Illinois found that an officer of a national bank can acquire the right to receive severance pay through written employment agreement. 271 Ill.App.3d 1124, 208 Ill.Dec. 431, 649 N.E.2d 487 (1 Dist.1995). In Mardula v. Rancho Dominguez Bank, a California court asserted that a severance-pay provision did not violate the National Banking Act. 43 Cal.App.4th 790, 51 Cal.Rptr.2d 63, 67 (1996).

.We are aware that this case was previously remanded from federal court. There, Appel-lees removed the case and argued that although plaintiffs' claims were entirely state law based, the district court would inevitably have to interpret the National Banking Act, a federal statute, thus the case should be in a federal court. The federal district court remanded the case to state court, reasoning that the fact that a defendant will raise a defense based on federal law is not sufficient to establish federal jurisdiction. That is distinct from the present dispute, where a state court is being asked to review the finality and appropriateness of federal agency action.

. 12 U.S.C. § 21 et seq.

. 12 U.S.C. § 1841 et seq.